DAWN M. CICA, ESQ.
Nevada Bar No. 4565
MICAELA RUSTIA MOORE, ESQ.
Nevada Bar No. 9676
**FOX ROTHSCHILD LLP**
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
Telephone: (702) 262-6899
Facsimile: (702) 597-5503
Email:  dcica@foxrothschild.com
            mmoore@foxrothschild.com
*Counsel for Debtors, Martifer Solar USA, Inc.*
*and Martifer Aurora Solar, LLC*

| Electronically Filed October 7, 2014 |

*(left margin, vertical)* FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>MARTIFER AURORA SOLAR, LLC, a Nevada limited liability company,<br><br>☐ Affects Martifer Aurora Solar, LLC<br>☐ Affects Martifer Solar USA, Inc.<br>☒ Affects all Debtors<br><br>               Debtors. | Case Nos. BK-S-14-10355-abl and BK-S-14-10357-abl<br><br>Jointly Administered under Case No. BK-S-14-10355-abl<br><br>Chapter 11 |
| MARTIFER SOLAR USA, INC., a Nevada corporation, and MARTIFER AURORA SOLAR, LLC, a Nevada limited liability company,<br><br>               Plaintiffs,<br><br>vs.<br><br>MARTIFER SOLAR, INC., a Delaware corporation; MARTIFER SOLAR S.A., a Portuguese company; MARTIFER SOLAR-SISTEMAS SOLARES, S.A., a Spanish company; MARTIFER-SILVERADO FUND I, LLC, a joint venture; FTP SOLAR, LLC, a Delaware limited liability company; MARTIFER SOLAR CANADA, LTD., a Canadian company, DOE DEFENDANTS I-X; and ROE CORPORATIONS I-X, inclusive,<br><br>               Defendants. | ADV. No.<br><br>**VERIFIED COMPLAINT** |

1

Plaintiffs Martifer Solar USA, Inc., and Martifer Aurora Solar, LLC, by and through their undersigned counsel, Fox Rothschild LLP, hereby submit this Verified Complaint and allege the following:

## I.

## PARTIES, JURISDICTION AND VENUE

### A.    The Parties.

1.    Plaintiff Martifer Solar USA, Inc. ("Martifer USA"), is a California corporation and a Debtor in one of the above-captioned cases (the "Martifer USA Chapter 11 Case").

2.    Plaintiff Martifer Aurora Solar LLC ("Aurora") is a Nevada limited liability company and a Debtor in one of the above-captioned cases (the "Aurora Chapter 11 Case"). Martifer USA and Aurora are individually and collectively referred to as the "Plaintiffs" or the "Debtors."

3.    Defendant Martifer Solar, Inc. (the "Parent"), is a Delaware corporation.

4.    Defendant Martifer Solar S.A. ("Portugal") is a *Sociedad Anomina* organized under the laws of the Republic of Portugal.  The Parent and Portugal are individually and collectively referred to as the "Owners."

5.    Upon information and belief, defendant Martifer Solar-Sistemas Solares, S.A. ("Sistemas") is a *Sociedad Anomina* organized under the laws of the Kingdom of Spain.

6.    Upon information and belief, defendant Martifer-Silverado Fund I, LLC ("Martifer Silverado") is a joint venture between the Parent and Silverado Power, LLC, in which the Parent has a 57.125% direct equity interest.

7.    Upon information and belief, defendant FTP Solar, LLC ("FTP") is a Delaware limited liability company in which the Parent is a direct or indirect member, and is the successor in interest to Martifer Silverado.

8.    Upon information and belief, defendant Martifer Solar Canada Ltd. ("Canada") is a Canadian company.

9.    The true names and capacities, whether individual, corporate, associate or otherwise of the defendants named herein as Does I though X, inclusive, and Roe Corporations I through X,

ACTIVE 27666031v1 10/07/2014

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

inclusive, are unknown to Plaintiffs at this time, who therefore sue defendants by fictitious names and will ask leave of the Court to amend this Verified Complaint to show the true names and capacities of defendants when the same are ascertained; some defendants are sued as principals and/or agents, servants, attorneys, and employees of said principals, and all of the acts performed by them were in the course and scope of their authority and employment; Plaintiffs are informed and believe and thereupon allege that each of said defendants is legally responsible in some manner for events and happenings referred to herein, and directly and proximately caused the damages and injuries to Plaintiffs as hereinafter alleged.

10.     The Owners, Sistemas, Martifer Silverado, FTP, Canada, Does I through X, and Roe Corporations I through X are collectively referred to herein as the "Defendants."

**B.     Jurisdiction and Venue.**

11.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (F), (H) &(O) and 1334.

12.     Venue for this adversary proceeding is proper in this District pursuant to 28 U.S.C. § 1409(a) because the Debtors' chapter 11 cases are pending in this Court.

13.     Additionally, both the Parent and Portugal have filed proofs of claims in these cases. See the Parent's Proofs of Claim Nos. 32, 33 & 33-2 filed in the Aurora Chapter 11 Case and the Parent's Proofs of Claim Nos. 56, 58, 60 & 61 filed in the Martifer USA Chapter 11 Case (collectively, with any other claims of the Parent, including claims related to the DIP financing (as defined below), the "Parent Claims"); Portugal's Proof of Claim No. 31 filed in the Aurora Chapter 11 Case and Portugal's Proof of Claim No. 59 filed in the Martifer USA Chapter 11 Case (collectively, with any other claims of Portugal, the "Portugal Claims").[1]  The Parent Claims and

---

[1] Pursuant to FRE 201(b), the Court may take judicial notice of a fact that is not subject to a reasonable dispute.  "[T]he Federal Rules of Evidence . . . permit this Court to take judicial notice, 'whether requested or not,' of its own docket and of pleadings filed in cases before it."  In re Kleibrink, 346 B.R. 734, 744 (Bankr. N.D. Tex. 2006), aff'd, No. 3:07-CV-0088-K, 2007 WL 2438359 (N.D. Tex. Aug. 28, 2007), aff'd, 621 F.3d 370 (5th Cir. 2010).  Courts may also take judicial notice of matters of public record.  In re Fink, 351 B.R. 511, 520 (Bankr. N.D. Ill. 2006).  Where such documents are signed under oath, such as schedules, statements and declarations, the documents may also be utilized as evidence once judicial notice is taken.  See, e.g., In re Harmony Holdings, LLC, 393 B.R. 409, 413-14 (Bankr. D.S.C. 2008).  Plaintiffs request that the Court take judicial notice of the pleadings specifically identified in this Verified Complaint, and consider as evidence such prior sworn statements.

ACTIVE 27666031v1 10/07/2014

the Portugal Claims are collectively referred to herein as the "Owner Claims."

**II.**

**RELEVANT FACTS**

A.    **The Corporate Structure.**

1.    **Martifer Group**

14.    The Martifer Group, a publicly traded Portuguese corporation, is the holding company of a portfolio of approximately 120 companies that are divided into four core business units: Metallic Construction, Energy Equipment, Advanced Fuels, and Electricity Generation.

2.    **Martifer Solar S.A. ("Portugal")**

15.    Portugal, one of the above-named Defendants herein, is a Portuguese company, a wholly owned division of the Martifer Group, and a direct parent of the Parent.  Portugal is a multinational solar developer, whose main activities are the production of solar photovoltaic energy systems, the construction of turn-key solar parks, and the promotion, licensing, operation, and maintenance of such solar parks.

3.    **Martifer Solar, Inc. (the "Parent")**

16.    The Parent, the second named Defendant, is a Delaware corporation, a virtually wholly-owned subsidiary of Portugal, and the direct parent of Martifer USA.

4.    **Martifer Solar-Sistemas Solares, S.A. ("Sistemas")**

17.    Sistemas, the third named Defendant, is a Spanish company, owned directly or indirectly by Portugal.

5.    **Martifer Silverado Fund 1, LLC ("Martifer Silverado") and Silverado Power, LLC (collectively, the "Silverado Project")**

18.    Martifer Silverado, the fourth named Defendant, is a joint venture between the Parent and Silverado Power, LLC, in which the Parent originally had a 51% direct equity interest. In 2012, the Parent acquired an equity interest in Silverado Power LLC, therefore increasing its direct and indirect equity interest in Martifer Silverado to an aggregate of 57.125%.  The Silverado Project was sold at the end of 2013 to Fir Tree Partners.  The Parent continues to hold an interest in FTP Solar, LLC, the successor to Martifer Silverado.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

1

2

3

4

5

6

7

8

9

10

11

12

13

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

       **6.**     **FTP Solar, LLC ("FTP")**

    19.    FTP, the fifth named defendant, is a Delaware limited liability company and the successor to Martifer Silverado.  The Parent is a direct or indirect member of FTP.

       **7.**     **Martifer Solar Canada Ltd. ("Canada")**

    20.    Canada, the sixth named defendant, is a direct subsidiary of Portugal.

       **8.**     **Martifer Solar USA ("Martifer USA")**

    21.    Martifer USA, one of the two Debtors and Plaintiffs herein, is a subsidiary of the Parent and a direct parent of Aurora.  The Parent is the holder of virtually all of Martifer USA's shares.

       **9.**     **Martifer Aurora Solar, LLC ("Aurora")**

    22.    Aurora, the second of the two Debtors and Plaintiffs herein, is a subsidiary of Martifer USA.

    **B.**     **The Debtors' Corporate History.**

    23.    Until March 2008, Martifer USA was doing business as A&M Home Improvement, Inc. ("A&M").  A&M's president was Raffi Agopian ("Agopian").  In 2007, the Parent (under the name of Martifer, Inc.) approached Agopian to purchase 50% of A&M's shares immediately, and an additional 1% of the shares one year later, as set forth in that certain *Letter of Intent* executed on December 3, 2007 (the "LOI").  The LOI provided for the Parent to acquire a controlling interest in the board of directors and to "invest sufficient additional capital into the corporate accounts of A&M from time-to-time to achieve the growth rates contemplated herein."  The LOI contemplated a 40% growth rate.  The parties subsequently set forth their rights in that certain *Shareholders Agreement* entered into on or around March 26, 2008 (the "Shareholders Agreement"), by and among A&M, Agopian and the Parent (under the name of Martifer, Inc.).[2]

///

///

///

---

[2] A true and correct copy of the Shareholders Agreement is annexed hereto as **Exhibit 1.**

ACTIVE 27666031v1 10/07/2014

24.    The Shareholders Agreement explicitly provided that the Parent would make capital contributions on an as-needed basis sufficient to support A&M's growth, and that such contributions would not be treated as debt:

> After the First Closing, **Martifer shall provide the Company with capital on an as-needed basis (the "Growth Capital"), in amounts sufficient to support the Company's growth in accordance with the Company's business plan**, which business plan shall be duly adopted by the Board of Directors and approved in writing by Agopian (the "Business Plan").  The parties agree that **any capital provided to the Company by Martifer** pursuant to this Section 7 shall not increase Martifer's equity position in the Company and **shall not be treated as a loan by Martifer to the Company**.  The parties further agree that (a) the Company's performance during the first twelve (12) months following the First Closing will not affect the foregoing obligation to provide capital to the Company; and (b) notwithstanding any failure by the Company at any time to achieve the economic milestones, including growth and profitability, anticipated in the Business Plan, or to achieve the growth or profitability that may be otherwise desired by Martifer, **Martifer shall at all times provide the Company with capital sufficient to meet its current and future obligations**, including without limitation any costs and liabilities incurred by the Company after the First Closing to support additional personnel, office space, equipment and vehicles acquired in furtherance of the Business Plan.  In no event shall Agopian be required to make any capital contributions.  This provision will survive any termination of this Agreement.[3]

25.    In 2009, the Parent purchased an additional 1% of the A&M shares and became A&M's majority shareholder.  The Parent also appointed the majority of A&M's board of directors, as set forth in that certain *Amended and Restated Shareholders Agreement* entered into on or around May 25, 2010, by and among A&M, Agopian and the Parent (under the name of Martifer Solar, Inc.) (the "Amended Shareholders Agreement").

26.    In July 2010, Aurora was incorporated in Nevada to take ownership of certain solar photovoltaic projects constructed by A&M in the Colorado area.  This began the A&M's expansion program, designed to take its business from California to a national platform.  Upon information and belief, the expansion program required an initial capital contribution of $3.5 million to create

---

[3] Shareholders Agreement, Exhibit 1, p. 4, § 7 (emphasis added).

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

ACTIVE 27666031v1 10/07/2014

the necessary infrastructure for A&M to become a national company, which the Parent approved and committed to make.

27.    On August 25, 2010, A&M changed its name to "Martifer Solar USA, Inc."

28.    Upon information and belief, after the execution of the Amended Shareholders Agreement, virtually all of the Debtors' major decisions -- including which employees the Debtors were forced to hire, what loans the Debtors were forced to make to the Martifer Group affiliates, and what debts the Debtors were forced to incur to backstop the Martifer Group's financials -- were made by the Owners (the Parent and Portugal), even over the objection of the Debtors' management.  See Section II.C below.

**C.    The Owners Control The Debtors' Board And Operations.**

29.    Pedro Gomes Pereira ("Pereira") is the President of the Parent and was the President of Martifer USA until his resignation on August 7, 2014 (the day before discovery was due from the Parent to Martifer USA with respect to the Parent's equitable subrogation claims).  He is also the head of the Martifer Group's North American Region on behalf of Portugal.  With the exception of the Peter Kravitz, appointed on March 19, 2014 as an independent director, all of Martifer USA's current directors are officers of the Parent:  Pereira (Member of the Executive Committee and Director of Martifer USA; President and Director of the Parent; head of North American Operations of Portugal[4]), Henrique Rodrigues (Member of the Executive Committee and Director of Martifer USA; Chief Executive Officer ("CEO") and Director of the Parent and Portugal) ("Rodrigues"), and Filipe Santos (Director of Martifer USA; Chief Financial Officer ("CFO") and Director of the Parent and Portugal) ("Santos") (collectively, Martifer USA's "Board").  On January 29, 2014, Rodrigues replaced Gustavo Fernandes (former Director of Martifer USA; Director of the Parent; Director of Portugal) ("Fernandes").  Although Roland Kiser ("Kiser") was also a Director of Martifer USA throughout 2013, Pereira, through the *Action By Written Consent of Shareholder*, was

---

[4] See *Joinder to Debtors' Reply to Objection of Cathay Bank to Second Motion for Order Pursuant to 11 U.S.C. 364 and Fed. R. Bankr. P. 4001(c): (I) Authorizing Debtors to Obtain Postpetition Financing; (II) Granting Related Relief; and (III) Scheduling Final Hearing* [ECF No. 205] (the "Joinder"), Exhibit A thereto, ¶ 4.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

the deciding vote for any Board deadlock.[5]

30.     The Parent's board members are Pereira (President), Rodrigues, Santos and Fernandes.

31.     Portugal's board members are Rodrigues (CEO), Santos (CFO), Silverio Pereira (Chief Technology Officer), and Fernandes (Chief Operating Officer "COO").  Upon information and belief, substantially all, if not all, decisions made by the Parent are required to be approved by Portugal.

32.     The Parent's offices and principal place of business were located at Martifer USA's offices:  2040 Armacost Ave., Los Angeles, CA 90025.  Although Pereira, as the President of the Parent, had the largest office in the building, the Parent never paid the Debtors rent or other expenses related to its office space.

33.     On October 6, 2011, the Parent placed Ana Correia ("Correia") at the Debtors as their Financial Controller.

34.     A few months later, in January, 2012, the Parent placed Helder Guimaraes ("Guimaraes") at the Debtors as the Vice President of Finance.  Prior to taking on that role, Guimaraes was a corporate controller for the Martifer Group in Portugal.  Upon information and belief, while acting as the Debtors' VP of Finance, Guimaraes simultaneously served as controller for the Parent, Martifer Silverado and Canada, and reported directly to Portugal.

35.     On behalf of the Parent, Pereira executed employment agreements to hire Kiser as the Debtors' CEO and Klaus Bernhart ("Bernhart") as the Debtors' CFO.  Per his contract, Bernhart was specifically required also to perform services for the Parent's Silverado Project.

36.     On or about January 24, 2014, Kiser and Bernhart concluded that it was in the Debtors' best interests to terminate Correia's employment because she was taking orders from the Parent rather than the Debtors.  In response, the Parent demanded, over Kiser's and Bernhart's objections, that the Debtors continue to employ Correia as a condition to the Parent's funding of the debtor in possession ("DIP") financing.

---

[5] See *Action by Written Consent of Shareholder of Martifer Solar USA, Inc.,* dated May 4, 2013, a true and correct copy of which is annexed hereto as **Exhibit 2**.

ACTIVE 27666031v1 10/07/2014

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

37.     In addition to Pereira, Guimaraes, Correia and Bernhart, at least two of the Debtors' other employees were required to perform services for the Owners:  Maya Rao ("Rao"), and Filipe Tralhao ("Tralhao").  Rao was terminated by the Debtors on August 8, 2014; the Owners have transferred Tralhao to Canada.

**D.       The Owners Grossly Undercapitalized The Debtors / Made Capital Contributions Disguised As Intercompany "Loans."**

38.     After the Parent acquired its controlling interest in the Debtors, it demanded that they meet unrealistically high projections, significantly undercapitalized them, and insisted that its cash infusions be treated as loans, not capital contributions.[6]  Because the Parent's officers simultaneously served as the Debtors' directors and controlled the Board, the Debtors were forced to comply.

39.     Commencing in 2012, the Parent directed Martifer USA to retain Kiser (first as CFO and then as CEO) to restructure Martifer USA.  Later, in early 2013, the Parent directed the retention of Bernhart (first as a consultant and then as CFO).  Upon information and belief, the Parent employed Kiser and Bernhart both (a) to evaluate and restructure the legacy projects of Martifer USA, and (b) to raise new capital for Martifer USA and for EPC contracts for the projects then held by Martifer Silverado.  See Sections II.F & II.K below.

40.     During this same timeframe, in late November 2012, the Parent caused Martifer USA to take out a loan from Cathay Bank ("Cathay") and transfer the two-thirds of the loan proceeds to the Parent, Portugal, Martifer Silverado, and/or Canada.  See Section II.E below.

41.     The Parent subsequently increased its equity position to 63% and, ultimately, to roughly 99% of Martifer USA.  Thus, on or about March 6, 2013, Martifer USA, Agopian, and the Parent entered into that certain *Settlement Agreement and Mutual Release* pursuant to which Agopian agreed to transfer all of his (and his trust's) remaining shares to the Parent and the Parent agreed to convert $9.2 million in purported "debt" to equity in Martifer USA.  Upon information

---

[6] See Joinder [ECF No. 205], Exhibit A thereto, ¶ 10; see also *Martifer Corporate Group Funding and Services Agreement* (the "Funding Agreement") annexed to the *Minutes of Meeting of Board of Directors of Martifer Solar USA, Inc. (January 29, 2014)* (the "1.29.14 Minutes"), a true and correct copy of which is annexed hereto as **Exhibit 3**.

9

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

and belief, Cathay demanded the conversion of the Parent's "debt" to equity after Martifer USA transferred $6.456 million (of the $9.81 million drawn) of the Cathay loan proceeds to the Parent, Portugal, Martifer Silverado, and/or Canada, in violation of the Cathay loan covenants and the subordination agreement executed by the Parent.  See Section II.E below.

42.    Upon information and belief, Portugal projected and expected the Debtors to make $70 million gross revenue in 2011 and $120 million gross revenue in 2012, requiring a substantial increase in the number of new projects, and annual growth of 300%-400%.  (In comparison, the Debtors' internal projected goals were $40 million gross revenue in 2011 and $70 million gross revenue in 2012.)

43.    Upon information and belief, despite the Debtors' concerns about not having enough cash flow to pay vendors and subcontractors on the new projects, Portugal assured the Debtors that it would provide the necessary financial support.  However, Portugal failed to provide the  promised financial support, causing the Debtors to fall behind on payments to their vendors and subcontractors, who then refused to provide services on projects until paid.

44.    Upon information and belief, the Debtors' management recommended to Portugal that the Debtors slow down their rapid growth and not take on any more new projects until they were able to complete the ones they were able to support financially.  Upon information and belief, Portugal expressed concern about how a failure to meet the projections would look to its shareholders, stressed the urgency of maintaining the projections, and repeated its assurances of financial support.  Again, the necessary financial support never materialized, causing the Debtors to default on payment to vendors and subcontractors, and ultimately resulting in subcontractors filing liens against the projects.

45.    When Portugal repeatedly failed to provide the Debtors with needed funding, the Debtors explored other alternative sources of financial support.  Upon information and belief, the Debtors hired a consulting group named Janas, who introduced them to the idea of partnering with Panasonic, because they were well capitalized and interested in the solar energy industry, but lacked solar expertise.

ACTIVE 27666031v1 10/07/2014

46.     In February, 2012, Panasonic flew its top decision makers in from Japan to meet at Martifer USA's offices and tour some of the Debtors' solar projects.  Upon information and belief, if the partnership with Panasonic had gone through, it would have brought the Debtors $25 million in financial backing.

47.     Upon information and belief, to the embarrassment of the Debtors' executives, the Portugal representative at the meeting with Panasonic announced that Martifer USA could not decide to partner with Panasonic, but that such decisions had to be made solely by Portugal, as Martifer USA's major shareholder.

48.     Upon information and belief, Portugal later met separately with Panasonic and suggested including in the partnership some of the Martifer Group's businesses in European countries (where, upon information and belief, the solar market was tapering off).

49.     Upon information and belief, Panasonic's due diligence took longer than anticipated because it was now required to examine the other Martifer Group businesses, in addition to the Debtors' U.S. business.  During that timeframe, Portugal's failure to fund the Debtors' operations had a negative impact on the Debtors' financials and unpaid vendors filing mechanics liens created legal issues for the Debtors.  In the Debtors' opinion, these issues, as well as the instability of the solar market in Europe, caused Panasonic to terminate negotiations on consummating a partnership, and settle for working together with the Debtors on a few projects in the United States.

50.     Not only did the Owners fail to provide the Debtors with the requisite financial support necessary to insure Debtors' liquidity for ongoing operations, but what little funding the Owners did provide the Debtors they insisted on calling "loans," not capital contributions, as they had promised.[7]  This purported "debt" only exacerbated the Debtors' financial distress and in March 2013 Cathay required conversion of $9.2 million of these "loans" to equity.

51.     As an example of the Owner's control, on or about July of 2013, the Parent requested Banco Espirito Santo ("BES") to issue two letters of credit in the name of Sistemas in the aggregate

_____

[7] See Shareholders Agreement, Exhibit 1, p. 4, § 7 ("Martifer shall provide the Company with capital on an as-needed basis (the "Growth Capital"), in amounts sufficient to support the Company's growth in accordance with the Company's business plan . . . .  The parties agree that any capital provided to the Company by Martifer . . . shall not be treated as a loan by Martifer to the Company.").

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

ACTIVE 27666031v1 10/07/2014

amount of $768,591.99 (the "Letters of Credit") for the benefit of certain of Martifer USA's vendors, allegedly to assist in Martifer USA's procurement of project supplies.  The Debtors' management initially was not aware of the Letters of Credit (which were issued to protect parent guarantees on these projects) and did not approve the issuance of the Letters of Credit.  On or about December of 2013, the vendors drew against the Letters of Credit.  On or about December 9, 2013, the Owners decided that they needed to repay their line of credit with BES, which included the Letters of Credit.  The Owners reduced the amount of funds they had promised to the Debtors and used those funds to pay BES $761,000, leaving the Debtors insufficient cash to meet payroll and make payments to Cathay and other venders.  Upon information and belief, at the instruction of the Parent, and over the objections of Kiser and Bernhart, Correia recorded the amounts of the Letters of Credit as loans from the Parent in the Debtors' books and records.

52.    By the time the Debtors filed their Chapter 11 Cases, they were burdened with over $14 million in purported debt to the Parent, nearly half of their total liabilities.[8]  None of that "debt" was evidenced by promissory notes or loan documents; rather, all of the Parent's capital contributions were just recorded (at the Parent's insistence) by Correia in the Debtors' books as unsecured debts.[9]

53.    The Debtors' financials reflect "notes payable" owing to the Parent, accruing interest at the EURIBOR (European Interbank Offered Rate) six month rate plus 5.5%, in the aggregate amount of $19.2 million as of December 31, 2012, and $15.3 million as of December 31, 2013.[10]

54.    The financials demonstrate that that the Debtors were insolvent on a balance sheet basis since at least December 31, 2012.  At the end of 2012, the Debtors' liabilities exceeded their assets by $740,892; by the end of 2013, the difference had widened to $3,101,882.[11]

55.    The financials also demonstrate that the Debtors were unable to pay their debts as they became due for at least four years before the Petition Date.  The Debtors had negative cash

---

[8]  See *Omnibus Declaration of Klaus Bernhart in Support of First Day Motions* [ECF No. 15] (the "Omnibus Declaration"), ¶ 22.

[9]  See Omnibus Declaration [ECF No. 15], ¶ 38 n.4.

[10]  See *Martifer Solar USA, Inc. and Subsidiary Consolidated Financial Statements (December 31, 2013 and 2012)* (the "2013 Audited Financials"), a true and correct copy of which is annexed hereto as **Exhibit 4**, at p. 4.

[11]  Id., p. 4.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

flow from operations of $3,334,654 in 2010,[12] negative cash flow from operations of $4,321,139 in 2011,[13] negative cash flow from operations of $18,398,245 in 2012,[14] and negative cash flow from operations of $2,091,909 in 2013.[15]

56.    In an effort to reduce the severity of the Debtors' insolvency and rectify the financial covenant default under the Debtors' secured line of credit (discussed in Section II.E below), the Parent "converted" $9.2 million (of the then-existing $18 million) in purported "loans" to equity on March 18, 2013.[16]  If the Parent had not done this "conversion," the Debtors' negative net worth would have exceeded negative $12.3 million at the end of 2013.[17]

57.    The Parent was contemplating making another "conversion" of approximately $10 million of "loans" to equity in or around December 2013, but refused to go forward once it was decided that the Debtors might need to file for Chapter 11 relief.[18]

58.    The Parent attempted to formalize the purported "loans" after the Petition Date by having Pereira execute, on behalf of the Debtors, the Funding Agreement[19] back-dated to January 1, 2012 for the benefit of the Parent; but the Debtors' Board subsequently rescinded such back-dated Funding Agreement.[20]

59.    The Owners also pressured the Debtors to repay such "loans," putting the Debtors under even greater financial stress.  The financials reflect that the Debtors made payments on notes payable to related parties totaling $9,072,062 for 2012 and $629,842 for 2013.[21]  And the Debtors' books and records reflect that in the one year preceding the Petition Date, the Debtors made $1,272,500 in wire transfers to the Parent.

---

[12] See *Martifer Solar USA, Inc. and Subsidiary Consolidated Financial Statements as of December 31, 2011 and 2010*) (the "2011 Audited Financials"), a true and correct copy of which is annexed here as **Exhibit 5**, at p. 7.
[13] Id.
[14] See 2013 Audited Financials, Exhibit 4, p. 7.
[15] Id.
[16] Id., p. 19.
[17] Id., p. 4.
[18] See emails dated between December 24, 2013 and January 5, 2014, from and between Emily Yukich, Pereira and Correia (collectively, the "Conversion Letter"), true and correct copies of which are annexed hereto as **Exhibit 6.**
[19] See Funding Agreement, a true and correct copy of which is annexed to the 1.29.14 Minutes, Exhibit 3.
[20] See *Addendum* to 1.29.14 Minutes, **Exhibit 7**, at p. 2, ¶ 4.
[21] Id., p. 7.

ACTIVE 27666031v1 10/07/2014

60.    In short, the Debtors are informed and believe that in the four years before the Petition Date, the Debtors made an aggregate of approximately $29,496,071[22] in payments to or for the benefit of the Defendants or their affiliated entities.

61.    In addition, in the year before the Petition Date, the Debtors are informed and believe that they made an aggregate of approximately $5,238,025 in payments to creditors whose debts the Defendants had guaranteed.

**E.    The Parent Caused The Debtors To Take Out The Cathay Loan And Immediately Transfer The Bulk Of The Proceeds To Affiliates.**

62.    In November, 2012, the Parent caused the Debtors to take out a secured line of credit from Cathay, allowing the Debtors to draw up to a maximum principal amount of $12 million (the "Cathay Loan") to be used for working capital.[23]    Simultaneously, the Owners executed guarantees in favor of Cathay, guaranteeing the indebtedness of the Debtors under the Loan (collectively, the "Guaranty"), and the Parent executed a subordination agreement, subordinating all of its rights and claims to Cathay's claims (the "Subordination Agreement").[24]    The Guaranty and Subordination Agreements were required to be delivered as a condition to the Cathay Loan.[25]    The Owners represented that the Debtors requested that the Guaranty and Subordination Agreement be issued on behalf of the Debtors, making the Debtors the beneficiaries of such Loan Documents.[26]

---

[22] This amount includes $5,846,800 in payments for modules that the Owners caused Debtors to purchase from Portugal.

[23] The Cathay Loan is evidenced in part by a Promissory Note dated November 15, 2012 (the "Cathay Note") and the "Business Loan Agreement (Asset Based)" (the "Cathay Loan Agreement").  The Cathay Loan is generally secured by (i) Martifer USA's personal property described in that certain Commercial Security Agreement dated November 15, 2012, executed by Martifer USA in favor of Cathay ("USA Security Agreement"), and (ii) Aurora's personal property described in that certain Commercial Security Agreement dated November 15, 2012, executed by Aurora in favor of Cathay ("Aurora Security Agreement" and, together with the USA Security Agreement, the "Security Agreements"). See true and correct copies of the Cathay Loan Agreement, Cathay Note, and Security Agreements, annexed as Exhibits 1-3 & 5 to the *Declaration of Eileen Lewis in Support of Secured Creditor Cathay Bank's Demand for Adequate Protection* [ECF No. 60] (the "Lewis Declaration").

[24] See true and correct copies of the Guaranty (the "Guaranty") and Subordination Agreement (the "Subordination Agreement"), annexed as Exhibits D & E to the *Declaration of Michael Tucker in Support of Debtors' Objection to Proof of Claim No. 33 (in Case No. 14-10355) and Proof of Claim No. 60 (in Case No. 14-10357) with Respect to Subrogation Filed by Martifer Solar, Inc.* [EFC No. 884] (the "Tucker Declaration").

[25] Cathay Loan Agreement, annexed as Exhibit 1 to the Lewis Declaration [ECF No. 60], p. 4.

[26] Guaranty, annexed as Exhibit D to the Tucker Declaration [EFC No. 884], p. 2; Subordination Agreement, annexed as Exhibit E to the Tucker Declaration [EFC No. 884] p. 2.

14

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

63. As set forth in the chart below, immediately after receipt of $9,810,202 in funding under the Cathay Loan during the months of November and December, 2012, in contravention of the loan documents, the Debtors transferred $6,456,000 of such funds directly to the Parent, Portugal, Martifer Silverado, and/or Canada.

| Date | Party | Wire In from Cathay | Loan Fees to Cathay | Wire Out to Affiliate |
|------|-------|--------------------:|--------------------:|----------------------:|
| 8/9/2012 | Cathay Bank | $          - | $      (5,000) | $          - |
| 11/27/2012 | Cathay Bank | 1,009,447 | - | - |
| 11/27/2012 | Cathay Bank | 6,361,905 | - | - |
| 11/27/2012 | Cathay Bank | - | (78,700) | - |
| 11/28/2012 | Martifer Solar SA | - | - | (4,130,000) |
| 11/28/2012 | Martifer Solar Canada | - | - | (370,000) |
| 12/13/2012 | Cathay Bank | 2,438,850 | - | - |
| 12/14/2012 | Martifer Silverado Fund | | - | (50,000) |
| 12/14/2012 | Martifer Silverado Fund | - | - | (1,000,000) |
| 12/17/2012 | Martifer Silverado Fund | | - | (900,000) |
| 12/20/2012 | Martifer Solar, Inc. | - | - | (6,000) |
| **Total Transfers** | | **$ 9,810,202** | **$ (83,700)** | **$ (6,456,000)** |

64. Thus, the Debtors **retained only approximately one-third** of the Cathay Loan proceeds received during 2012 – and **transferred approximately two-thirds** to the Owners and their affiliates. The transfers to the Owners and their affiliates were in **direct violation** of the Cathay Loan Agreement's requirement that the Debtors "*[u]se all Loan proceeds solely . . . [t]o support Solar engineering, procurement and construction services*"[27] and its **prohibition** against "*transfer[ing] . . . any of Borrower's assets*"[28] without Cathay's prior written consent. The transfers also caused the Debtors to **violate** the Cathay Loan Agreement's **financial covenants**,[29] which lead to Cathay's requirement that the Parent "convert" $9.2 million in purported "loans" to equity to restore compliance with such financial covenants (see supra paragraph 56 ).

---

[27] See Cathay Loan Agreement, annexed as Exhibit 1 to the Lewis Declaration [ECF No. 60], p. 4.
[28] See id., p. 5.
[29] See id., p. 4 (Debtors must maintain "a ratio of Debt /Worth not in excess of 3.500 to 1.000" and a "Current Ratio in excess of 1.000 to 1.000").

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

ACTIVE 27666031v1 10/07/2014

65.     Moreover, the Debtors were required to pay Cathay $5,000 in audit fees, $78,700 in loan fees and finance charges, and $403,854 in interest/costs over the life of the Cathay Loan, approximately two-thirds of which they received zero benefit from (having transferred approximately two-thirds of the Loan proceeds to the Owners and their affiliates).

66.     By using the secured Cathay Loan to pay down the Owners' unsecured "debt," the insider Owners severely disadvantaged the Debtors' unsecured creditors, who subsequently found themselves behind $8,800,755 in additional secured debt.  Only approximately $1,009,447 of the $9,810,202 in Cathay Loan proceeds was used to pay off the Debtors' prior secured line of credit at California Bank & Trust.  As noted above, $6,456,000 of the balance was transferred to the Owners and their affiliates, leaving the Debtors with only $2,261,055 in additional funding.

**F.     The Owners Insisted That The Debtors Repay, Rather Than Restructure, The Unworkable Cathay Loan To Reduce The Owners' Guaranty Exposure.**

67.     The Owners' paramount desire to treat the Debtors as an extension of themselves and to take care of themselves (to the detriment of others) is also unmistakable in their insistence that the Debtors prioritize the repayment of Cathay (and correspondingly reduce the Owners' exposure on their Guaranty), rather than restructure the unworkable Cathay loan while the Debtors had the financial wherewithal and negotiating leverage to do so.

68.     In late November, 2012, the Debtors engaged Kiser as the Debtors' new CFO.[30] Kiser, among other positions, had served as the General Manager and Chief Operating Officer of HSH Nordbank where he facilitated the growth of HSH Nordbank's energy business to become a $6 billion leader in renewable energy financing, funding more than 4.5 GW (gigawatts) of wind and solar projects.[31]  Not long thereafter, the Debtors engaged Bernhart as the Debtors' consultant.[32] Bernhart had served in several capacities at HSH Nordbank – including as the Senior Executive Vice President, the General Manager, the Regional Head of the Americas and the Global Head of Energy.[33]

---

[30] See Omnibus Declaration [ECF No. 15], ¶ 52.
[31] See id.
[32] See id., ¶ 53.
[33] See id., ¶ 6.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

ACTIVE 27666031v1 10/07/2014

69.    In March 2013, Pereira (who was then just recently transferred to the Martifer Group's North American Region) executed an employment agreement with Kiser appointing him as the Debtors' CEO, and an employment agreement with Bernhart appointing him as the Debtors' CFO.

70.    Kiser and Bernhart made the early assessment that the Cathay Loan was not properly structured to suit the Debtors' operations.[34]  Specifically, the Cathay Loan was structured as though the Debtors were in the residential side of solar construction, despite the fact that they had transitioned largely to the commercial side.[35]

71.    The Loan Documents capped the Debtors' maximum Cathay Loan balance based on a "Borrowing Base" calculated with reference to the Debtors' "current" receivables.  If the Cathay Loan balance exceeded the Borrowing Base, the Cathay Loan documents required the Debtors to make an immediate pay down of the Loan in the amount of the difference.  Moreover, the Cathay Loan documents provided that once receivables aged past 120 days (and became "stale" receivables), they were automatically deleted from and caused a decrease in the Borrowing Base; this, in turn, necessitated the Debtors' immediate pay down of the Cathay Loan balance in an amount proportional to the decrease.[36]

72.    In contrast to residential solar construction (where projects might generally be completed in 120 days), payment timetables on the commercial side were much more subject to fluctuation as a typical commercial installation could take more than six (6) months to complete.[37]  Hence, a 120 day-receivable "ripeness" approach was inappropriate and unworkable for the Debtors' businesses.

73.    The Debtors' delays in their receipt of receivables, including U.S. Treasury Grants, required pay-downs of the Cathay Loan and exacerbated the Debtors' financial distress.[38]

---

[34] See id., ¶ 54.
[35] See id., ¶ 36.
[36] See id., ¶ 35.
[37] See id., ¶ 36.
[38] See id., ¶ 30.

ACTIVE 27666031v1 10/07/2014

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

74.    The Debtors repeatedly approached Cathay about restructuring the Cathay Loan in the first quarter of 2013, but Cathay responded that it saw no need to restructure the Cathay Loan at that point in time and wanted to defer such a discussion until a date closer to November 2013, when the Cathay Loan would mature.[39]

75.    By July, 2013, the Debtors were experiencing such financial difficulty due to, among other things, their delay in collection of legacy receivables (which had been discussed between Kiser and Santos at length between November of 2012 and July of 2013) that Bernhart reported to the Board that the Debtors may have to file for chapter 11 relief.[40]  Pereira, Fernandes, and Santos (as noted above, the Parent's President, COO and CFO, and each also a Director of the Parent) were among the directors in attendance.  Although the Board would not authorize a chapter 11 filing based on its determination that "there was no foreseeable near term need for the filing of such petition,"[41] just one month later (on August 19, 2013), the Debtors received a notice of default from Cathay.[42]

76.    In reliance on the Owners' commitment to continue to fund their operations, the Debtors did not file for bankruptcy then, but proceeded under an informal forbearance agreement with Cathay, requiring the Debtors and the Owners to pay down the Cathay Loan by $2.1 million before December 31, 2013.[43]  In other words, rather than file for chapter 11 and seek to restructure the Cathay Loan in a plan of reorganization (which would have left the Owners exposed on their Guaranty), the Debtors were directed by the Owners to use their cash resources and/or incur further Parent loans to pay down Cathay.

77.    In the year before the Petition Date, the Debtors made over $3.9 million in payments to Cathay in reduction of the Cathay Loan,[44] preferentially benefitting the guarantors (the Parent

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

[39] See id., ¶ 55.
[40] See *Minutes of Meeting of Board of Directors of Martifer Solar USA, Inc. (July 8, 2013)* (the "7.8.13 Minutes"), a true and correct copy of which is annexed hereto as **Exhibit 8**.
[41] See id.
[42] See *Minutes of Meeting of Board of Directors of Martifer Solar USA, Inc. (January 16, 2014)* (the "1.16.14 Minutes"), a true and correct copy of which is annexed hereto as **Exhibit 9**.
[43] See id.
[44] See *Declaration of Gregory Badura in Support of Cathay Bank's (1) Opposition to Motion for Authority to Pay Certain Subcontractor Claims; (2) Omnibus Opposition to Entry of Final Orders Authorizing the Debtors to Use the*

ACTIVE 27666031v1 10/07/2014

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

and Portugal) by a dollar-for-dollar reduction of their exposure on the Guaranty.  Yet, as noted above (Section II.E), the Debtors retained only $2.26 million of the initial $9.8 million in Cathay funding, after paying off their existing secured line of credit ($1.01 million), and being forced to transfer $6.45 million to the Owners and their affiliates.

**G.**    **The Owners Insisted That The Debtors Repay Any Vendors Claims Guaranteed By The Owners.**

78.    In addition to insisting that the Debtors prioritize the repayment of Cathay, the Owners also pressed the Debtors to repay vendor claims that the Owners had guaranteed and to manipulate their business dealings to benefit the Owners.

79.    For example, on December 10, 2012 and May 31, 2013, Portugal executed a "Comfort Letter," guarantying performance and payment by Martifer USA under its Subcontractor Agreement with Solarmarkt US Corp. DBA Creotecc ("Creotecc") for up to $1,018,961.[45]  Upon information and belief, as the Debtors prepared to file their Chapter 11 Cases, the Parent asked them to seek an injunction against Creotecc's enforcement of the Comfort Letter, and to pay Creotecc's pre-petition claim out of the DIP financing.  The Owners also demanded that any amounts that they paid to Creotecc would be rolled up into the DIP financing, but the Debtors rejected that demand.

80.    In addition, the Owners had fully indemnified a surety that had posted a performance bond in the amount of $317,952 on one of the Debtors' projects with Panasonic Eco Solutions North America ("Panasonic").  After the filing of the Chapter 11 Cases, the Owners put continuous pressure on the Debtors to reach a settlement agreement with Panasonic that would relieve the Owners of their obligation to indemnify the surety under the bond.[46]  The Owners also demanded that any amounts that they contributed to the settlement agreement would be rolled up into the DIP

---

*Bank's Cash Collateral and Obtain Post-Petition Financing of the Terms the Debtors Propose; and (3) Motion for an Order Directing the Appointment of a Chapter 11 Trustee in These Cases* [ECF No. 552], Exhibits 11 & 12 thereto.

[45] See Comfort Letters from Martifer Solar SA to Solarmarkt US Corp. DBA Creotecc, dated December 10, 2012 and May 31, 2013, true and correct copies of which are annexed hereto as **Exhibit 10**.

[46] See *Declaration of Michael Tucker in Support of Debtor's Motion for Approval of Settlement Agreement, Pursuant to Fed. R. Bankr. P. 9019, Between Martifer Solar USA, Inc., Panasonic Eco Solutions North America, and Martifer Solar, Inc.* [EFC No. 870], ¶ 18.

ACTIVE 27666031v1 10/07/2014

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

1    financing, but the Debtors rejected that demand after the Parent reneged on its commitment to fund

2    the DIP.

3          **H.**      <u>**The Owners Withdrew Financial Support.**</u>

4          81.     On December 9, 2013, the Debtors learned that the Owners' previously committed

5    financial support would not be forthcoming, and the Board consented to the Debtors' filing of

6    petitions for relief under chapter 11.[47]  That same month, upon information and belief, the Parent

7    substantially reduced the promised December funding of the Debtors' operating expenses due to its

8    diversion of $761,000 to pay BES, and Cathay began to sweep the Debtors' account, making it

9    difficult for the Debtors to meet payroll and other obligations.[48]  Upon information and belief, Kiser

10    advised Santos on or about December 18, 2013, that the amount that Portugal finally agreed to fund

11    the Debtors would "not be sufficient to make any repayment to Cathay – a fact we just wanted to

12    <u>*high-light*</u>!" Cathay subsequently commenced suit against the Debtors and the Parent to, among

13    other things, appoint a receiver and collect all purported indebtedness (the "<u>Receivership</u>

14    <u>Action</u>").[49]

15          82.     The Parent independently met with Cathay to discuss a repayment plan in which the

16    Parent would pay Cathay $2.1 million by January 17, 2014 and $525,000 each month thereafter

17    until Cathay was paid in full.[50]  At the same time, the Parent was considering, in the alternative, to

18    use the funds to provide the DIP financing rather than paying down the obligations to Cathay.[51]  The

19    Parent had  represented to the Debtors that it had insufficient assets both to pay Cathay and to fund

---

[47] *Action by Unanimous Written Consent of the Management Committee of Martifer Aurora Solar, LLC*, a true and correct copy of which is annexed to the Voluntary Petition [ECF No. 1 – Case No. BK-S-14-10355]; and *Action by Unanimous Written Consent of the Board of Directors of Martifer Solar USA, Inc.*, a true and correct copy of which is annexed to the *Voluntary Petition* [ECF No.1 – Case No. BK-S-14-10357] (collectively, the "<u>Bankruptcy Authorization</u>").

[48] <u>See</u> 1.16.14 Minutes, Exhibit 9.

[49] <u>See</u> *Cathay Bank, a California banking corporation v. Martifer Solar USA, Inc., a California corporation; Martifer Aurora Solar, LLC, a Nevada limited liability company; Martifer Solar, Inc., a Delaware corporation; and Martifer Solar, S.A., a Portuguese corporation*, Case No. SC121853, pending against the Parent and Portugal before the Superior Court of California, County of Los Angeles, West District.  Pursuant to the *Amended Order Granting Debtors' Motion for Approval, Pursuant to Fed. R. Bankr. P. 9019, of Settlement Agreement with Cathay Bank* [ECF No. 1070], approving and authorizing the Debtors to enter into the *Settlement Agreement and Release* with Cathay [see ECF No. 1006, Exhibit 1 thereto], Cathay dismissed the Receivership Action against the Debtors only.

[50] <u>See</u> 1.16.14 Minutes, Exhibit 9.

[51] <u>See</u> *id.*

ACTIVE 27666031v1 10/07/2014

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

the DIP, and would be required to choose between these alternatives.[52]  As discussed in Section II.I below, in January, 2014, the Parent decided on the bankruptcy/DIP alternative.

> ### I.    The Debtors File For Bankruptcy Based On The Owners' Commitment To Provide $5 Million In DIP Financing And Support A Plan Of Reorganization.

83.    Refusing to agree to Cathay's proposed repayment plan, the Parent instead authorized the Debtors to file their Chapter 11 Cases on January 14, 2014,[53] and shortly thereafter agreed to provide the Debtors with DIP financing.[54]  On January 21, 2014 (the "Petition Date"), the Debtors filed the Aurora Chapter 11 Case and the Martifer USA Chapter 11 Case to stay the Receivership Action (set for hearing the following day), in reliance on the Parent's commitment to provide $5 million in DIP financing and to fund a plan of reorganization.  During the negotiation of the DIP agreement, the Debtors stressed to the Parent that, in the absence of its commitment to fund both the DIP and a plan of reorganization, the Debtors would file petitions to convert their Cases to Chapter 7.  Moreover, the Debtors' professionals made clear that without an adequate "carve-out" for the fees they would be required to incur in representing the Debtors, they would be unwilling to continue to provide services.

84.    On January 24, 2014 the Plaintiffs filed their *Motion for Order Pursuant to 11 U.S.C. § 364 and Fed. R. Bankr. P. 4001(c): (I) Authorizing Debtors to Obtain Postpetition Financing; (II) Granting Related Relief; and (III) Scheduling Final Hearing* (the "First DIP Financing Motion") [ECF No. 37].  A true and correct copy of the *Debtor-in-Possession Credit Agreement* (the "First DIP Agreement") was annexed as Exhibit 4 to the *Supplemental Declaration of Klaus Bernhart in Support of First Day Motions* [ECF No. 40].  The First DIP Agreement provided that the Parent would provide the Debtors with up to $5 million in DIP financing, $2 million of which would be used to pay professionals on account of professional fees incurred (the "Carve-Out").  *See* First DIP Agreement, p. 3 ("Carve-Out") & p. 6 ("Maximum Commitment Amount").  The Court did not approve the First DIP Agreement in large part due to Cathay's

---

[52] *See* *id*.

[53] *See* the Bankruptcy Authorization [ECF Nos. 1].

[54] *See* DIP Agreement, a true and correct copy of which was annexed as Exhibit 4 to the *Supplemental Omnibus Declaration of Klaus Bernhart in Support of First Day Motions* [ECF No. 40 – Case No. BK-S-14-10357].

ACTIVE 27666031v1 10/07/2014

aggressive "scorched earth" objections, made in response to the Owners' refusal to stand behind their Guaranty before the filing of the bankruptcy cases.

85.    On February 4, 2014, the Plaintiffs filed their *Second Motion for Order Pursuant to 11 U.S.C. § 364 and Fed. R. Bankr. P. 4001(c): (I) Authorizing Debtors to Obtain Postpetition Financing; (II) Granting Related Relief; and (III) Scheduling Final Hearing* [ECF No. 85] (the "Second DIP Financing Motion").  As set forth in the Second DIP Financing Motion and related *First Amended and Restated Debtor-in-Possession Credit Agreement* (the "Amended DIP Agreement" [55] and, together with the First DIP Agreement, the "DIP Agreement"), the Parent agreed to provide the Debtors with up to $5 million aggregate DIP financing as an unsecured loan with a superpriority administrative claim (the "DIP Financing"), including the Carve-Out and $2.5 million budgeted for the administrative operating costs of the bankruptcy cases in connection with a plan of reorganization.[56]  On February 25, 2014, the Court approved the Amended DIP Agreement, with some additional changes, in its *Interim Order on Debtors' Second Motion for Order Pursuant to 11 U.S.C. §364 and Fed. R. Bankr. P. 4001(c): (I) Authorizing Debtors to Obtain Post Petition Financing; (II) Granting Related Relief; and (III) Scheduling Final Hearing* [ECF. No. 231] (the "Interim DIP Order").

86.    Based on the DIP Financing, the Debtors entered into contracts for new business, including a contract with FRI Energy, and contemplated entering into other contracts for new projects.

87.    Also on February 4, 2014, Pereira, on behalf of the Owners, advocated a plan of reorganization that would pay Cathay Bank in full within 1 year and the remaining creditors in full within 3 years.[57]  Pereira explicitly stated that the Owners had checked the baseline figures upon

---

[55] A true and correct copy of the Amended DIP Agreement was annexed as Exhibit 1 to the *Declaration of Klaus Bernhart in Support of Second Motion for Order Pursuant to 11 U.S.C. § 364 and Fed. R. Bankr. P. 4001(c): (I) Authorizing Debtors to Obtain Postpetition Financing; (II) Granting Related Relief; and (III) Scheduling Final Hearing* [ECF No. 87].

[56] See Amended DIP Agreement, [ECF No. 87, Exhibit 1 thereto], p. 3 ("Carve-Out") & p. 6 ("Maximum Commitment Amount").

[57] See February 4, 2014 email from Pereira to Kiser, et al., a true and correct copy of which is annexed hereto as **Exhibit 11**.

ACTIVE 27666031v1 10/07/2014

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

1    which they based their repayment plan.[58]    The repayment plan contemplated the use of the full

2    $5 million in DIP Financing.[59]

3    88.    In recognition of the Debtors' ongoing undercapitalization, Pereira's Joinder on

4    behalf of the Parent in support of the DIP Financing states: "As with the DIP Financing Agreement,

5    the Amended DIP Agreement provides the US Parent's agreement to negotiate the [conversion of]

6    outstanding balance under the DIP Financing into equity in the Reorganized Debtors under the

7    Plan."[60]

8    **J.    The Owners Renege On DIP Commitment And Plan.**

9    89.    After choosing the DIP Financing/reorganization plan alternative in January, and

10    executing the DIP Agreement, the Owners claim they changed their mind the following month

11    because the Court refused to issue their requested injunction against enforcement of the Guaranty.

12    90.    Thus, as early as in mid-February 2014, the Parent began separately negotiating a

13    settlement agreement with Cathay based on Cathay's earlier proposal to pay down the Cathay Loan

14    by $2.1 million immediately, with the balance to be paid out monthly over two years.  However,

15    because (as noted above) the Parent stated that it could not afford both to fund the DIP and pay

16    Cathay, pursuing settlement with Cathay meant reneging on the DIP Financing commitment.[61]

17    Hence, *the Parent took the $2 million it had promised as the Carve-Out to the professionals and*

18    *used it instead to make $2.1 million in payments to Cathay* ($300,000 on May 15, 2014 and

19    $1.8 million on April 10, 2014) *in exchange for a standstill of enforcement of the Guaranty and*

20    *discovery related thereto* (completely *unnecessary to the Debtors*, who were protected by the

21    automatic stay).[62]

22    91.    On April 8, 2014, the Debtors filed the *Declaration of Michael Tucker in Support of*

23    *(A) Motion for Interim and Final Order Pursuant to 11 U.S.C. §§ 361, 362 and 363 and Fed. R.*

24    *Bank. P. 4001(b) and 4001(d); (I) Authorizing Debtors to Use Cash Collateral and Provide*

25

26    [58] Id.
        [59] Id.

27    [60] See Joinder [ECF No. 205], Exhibit A thereto, ¶ 13.
        [61] See 1.29.14 Minutes, Exhibit 3.

28    [62] See Parent Claims.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

ACTIVE 27666031v1 10/07/2014

*Adequate Protection; (II) Granting Related Relief; (III) Scheduling Final Hearing; and (B) Amended Motion for Authority to Obtain Credit Under Section 364(b), Rule 4001(c) or (d) Motion for Order Pursuant to 11 U.S.C. § 364 and Fed. R. Bank. P. 4001(c): (I) Authorizing Debtors to Obtain Post Petition Financing; (II) Granting Related Relief; and (III) Scheduling Final Hearing that set forth their updated liquidity needs through May 31, 2014* [ECF No. 586] (the "<u>Cash Collateral Declaration</u>").  The Cash Collateral Declaration contained a budget (the "<u>Liquidity Budget</u>") showing the Debtors' estimated liquidity needs.*

92.     The Liquidity Budget had been the subject of an all-hands settlement meeting (the "<u>Settlement Meeting</u>") held the previous day (April 7, 2014) among the Debtors, the Parent, Cathay, and the Official Committee of Unsecured Creditors (the "<u>Committee</u>"), and each of their respective counsel.  Shortly thereafter, in accordance with the discussions held by the parties at the Settlement Meeting, on April 10, 2014, the Debtors, the Parent, Cathay, and the Committee memorialized such discussions into an executed global stipulation (the "<u>Global Stipulation</u>").[63]  The Global Stipulation includes, as was discussed at the Settlement Meeting, the Parent's promise to fund the liquidity needs of the Debtors (the "<u>Funding Promise</u>").[64]

93.     The Debtors' liquidity needs had been discussed at great length during the Settlement Meeting, and were set forth in great detail in the Cash Collateral Declaration filed the day thereafter.  Hence, at the time the Parent entered into the Global Stipulation and made the Funding Promise, the Owners were well aware of the Debtors' liquidity needs.[65]

94.     On April 11, 2014, upon consideration of the Global Stipulation, the Court entered the *Order Approving the Stipulation Between the Debtors, Martifer Solar Inc., Cathay Bank and the Official Committee of Unsecured Creditors* [ECF No. 611] (the "<u>Global Stipulation Order</u>").

95.     Pursuant to the Global Stipulation Order, the Parent was required "to support the liquidity needs of the Debtors, but the specific amounts and timing of funding is to be reasonably agreed upon by the CRO of the Debtors and the Parent given the liquidity needs of the Debtors,

---

[63] <u>See</u> *Stipulation Between the Debtors, Martifer Solar Inc., Cathay Bank and the Official Committee of Unsecured Creditors* [ECF No. 606] (the "<u>Global Stipulation</u>").
[64] <u>See</u> Global Stipulation [ECF No. 606], p. 7, ll. 8-12.
[65] <u>See</u>, <u>generally</u>, Cash Collateral Declaration [ECF No. 586].

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

24

1    upon consultation with the Committee."[66]

2    96.    There were no pre-conditions to such funding; rather, the parties simply agreed to

3    allow the priority as set forth in the Interim DIP Order.[67]

4    97.    Despite the clear agreement of the parties, and this Court's clear and unequivocal

5    Global Stipulation Order approving such agreement, the Parent has refused and continues to refuse

6    to provide funding to the Debtors in accordance with its Funding Promise.

7    98.    Hence, although by February 27, 2014, the Parent funded $2.16 million in DIP

8    financing, and at the meeting of the parties in early April, the Parent agreed to "fund the liquidity

9    needs of the debtor," on or about May 8, 2014 *the Parent indicated that it no longer intended to*

10    *provide the remaining $2.84 million of its DIP Financing or honor its Funding Promise because*

11    *it had used the balance of the promised DIP funds to pay down its Guaranty obligations to*

12    *Cathay instead.*

13    99.    The Parent subsequently funded only another $350,000 of the DIP in May, 2014, for

14    a total of $2.51 million – approximately half the committed amount.  Because the Parent refused to

15    honor the Funding Promise, as presented to the Court in the Global Stipulation, the Debtors were

16    required to negotiate the receipt of even the $350,000 amount.[68]

17    100.    Yet at the very same time that the Parent was negotiating with Cathay (to use the

18    funds it had committed to the DIP Financing for Cathay Loan pay-downs instead), the Parent was

19    continuing to provide assurances of adequate DIP funding to the Debtors and their professionals.  In

20    fact, *as recently as May 28, 2014*,[69] Santos and Pereira, on behalf of the Parent, confirmed that the

21    Parent was "*committed to continue to provide support to the Company* for Engineering,

---

[66] See Global Stipulation Order [ECF No. 611], p. 3, ll. 20-22.
[67] See Global Stipulation Order [ECF No. 611], p. 3, ll. 20-24.
[68] See *Stipulation Pursuant to 11 USC § 364 and Fed. R. Bankr.P 4001(c): (I) Authorizing Debtors to Obtain Postpetition Financing; and (II) Granting Related Relief* [ECF No. 810] (the "Final DIP Stip").  In addition to the amounts to be given to the Debtors, the Final DIP Stip also provided for the Parent's agreement to pay Cathay the sum of $300,000 on each of June 15, 2014 and July 15, 2014.  See id., p. 3.  The Parent failed to make the June 15, 2014 payment.
[69] See Letter dated April 30, 2014 to WuHoover & Co. LLP (the "Auditors"), signed by Pereira and Santos and delivered via email from Pereira to the Auditors on May 28, 2014 (collectively, the "Management Representation Letter"), true and correct copies of which are annexed hereto as **Exhibit 12**.  As indicated in the correspondence, although the Management Representation Letter is dated April 30, 2014, Pereira and Santos did not deliver it to the Auditors until May 28, 2014.

ACTIVE 27666031v1 10/07/2014

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

Procurement and Construction projects and development *in the next three years*.  In addition, the Parent Company *committed up to $5.0 million Debtor-in-Possession financing* (the "DIP financing") and as of April 21, 2014, $2.2 million was already drawn under the DIP financing."[70]

101.    Based upon the Management Representation Letter, the notes to the Debtors' audited 2013 financial statements repeat the Parent's intention to honor the DIP Financing commitment and further explain that "[t]he Bankruptcy Filing is intended to permit the Company to reorganize and increase liquidity, resolve legacy liabilities and focus on new projects to enable sustainable profitability. *The Company's goal is to develop and implement a reorganization plan that meets the standards for confirmation under the Bankruptcy Code*. . . .  The Company intends to propose a reorganization plan on or prior to the applicable date required under the Bankruptcy Code.  The Company expects that any proposed reorganization plan will provide, among others, mechanisms for settlement of claims against the Debtor's estates, treatment of the Company's existing equity and debt holders, and certain corporate governance and administrative matters pertaining to the reorganized Company."[71]   In the Management Representation Letter dated April 30, 2014 and delivered on May 28, 2014, Pereira and Santos approved these notes as accurate and disclosed no subsequent events that would make the representations contained therein untrue.[72]

**K.    The Owners Valued The Debtors' AR At $15-18 Million.**

102.    According to the Parent, a motivating factor behind the Parent's decision to renege on its DIP Financing commitment was the Owners' discovery that the Debtors' main asset, their accounts receivable ("AR"), was likely worth less than formerly valued by the Owners' hand-picked advisors.[73]

103.    However, on information and belief, the Owners knew the AR was over-valued very early on.  The Debtors believe that Kiser advised Santos of issues with "legacy projects" soon after he was hired in November 2012.  The Parent acknowledged problems with the legacy projects in a

---

[70] See id. (emphasis added).
[71] See 2013 Audited Financials, Exhibit 4, pp. 8-10 (emphasis added).
[72] See Management Representation Letter, Exhibit 12.
[73] See June 20, 2014, letter from Brian Lindsey to Dawn Cica (the "Lindsey Letter"), a true and correct copy of which is annexed hereto as **Exhibit 13**, p. 1.

ACTIVE 27666031v1 10/07/2014

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

presentation to Martifer USA from the "Shareholder's Perspective" in mid-November 2012.  The Debtors believe that, in December 2012, Kiser sent a presentation to Santos which indicated, under "Finance," that there were "no sustainable revenue streams."  The Debtors believe that, at the end of February 2013, Pereira (then the Director of Europe), advised Kiser that the Owners' appraisal of the company was zero, as it was in a bankrupt situation.  The Debtors believe that, in March 2013, Kiser advised Pereira, Santos and Fernandes of the issues with each of the legacy accounts receivable.  The Debtors believe that discussions continued regarding the legacy AR, resulting in the discussion at the board meeting in July 2013.[74] Certainly by December 2013, everyone was aware of the magnitude of the problem.  The unaudited November 30, 2013 financials, discussed in connection with the Debtors' First Day Motions, showed AR valued at $18.7 million.[75]

104.    The 2013 Audited Financials, dated April 30, 2014, value the AR at an aggregate of about $15.4 million, and contain the Parent's commitment to support the Debtors' EPC projects and development for three years and up to $5 million in DIP financing.[76]  As noted above, these Financials were approved by Pereira and Santos (both directors of the Debtors and officers of the Owners) in the Management Representation Letter delivered on May 28, 2014.[77]

105.    Moreover, on information and belief, as late as February 25, 2014, a month after the filing of the Petition, Correia, her counterpart in Portugal (Pedro Maia), and Pereira prepared a budget for the auditors showing that the Debtors' income before tax was going to increase by approximately $18,000,000 in 2014 and that sales would increase by approximately $35,000,000 in 2014.[78]

106.    All of the Debtors' creditors, including their professionals, relied on the valuation of the Debtors' AR and the Parent's DIP Financing commitment to make the reorganization possible and assure their repayment.

---

[74] See 7.8.13 Minutes, Exhibit 8.
[75] See Omnibus Declaration [ECF No. 15], ¶ 22.
[76] See 2013 Audited Financials, Exhibit 4, pp. 3 & 10.
[77] See Management Representation Letter, Exhibit 12.
[78] See February 4, 2014 email from Pereira to Kiser, Exhibit 11.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

ACTIVE 27666031v1 10/07/2014

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

**L.    The Owners Insist On FTI's Engagement.**

107.    Not long after the Debtors filed for bankruptcy, the Parent expressed displeasure with Kiser and Bernhart for failing to act sufficiently in accord with the Owners' interests.  As a result of the Parent's displeasure, the Debtors interviewed financial advisors and selected FTI as the most suitable candidate to assist them with the restructuring process.  Subsequently, the Parent, touting its status as the DIP lender, insisted on having the right to select the Debtors' financial advisor. After interviewing several parties, the Parent also selected FTI as the most suitable candidate,[79] but then proceeded to renegotiate the terms of FTI's engagement that had previously been agreed upon by FTI and the Debtors.

108.    Hence, at the Parent's insistence, in March, 2014, the Debtors engaged Michael Tucker ("Tucker") as the Debtors' Chief Restructuring Officer and other members of FTI to provide advisory services.[80]

109.    The FTI Engagement Agreement specifically provides that the FTI professionals are to be compensated at their respective current hourly rates (other than Chris LeWand and Scott Javor, who will each be billed at fixed monthly rate of $25,000 per month).[81]  In addition, the FTI Engagement Agreement provides that FTI will be entitled to a completion fee of between $300,000 and $600,000 upon the confirmation of a plan or the sale of substantially all of the Debtors' assets as part of a plan.[82]

110.    While the scope of FTI's work and estimated cost were being negotiated by the Parent, FTI inquired about the DIP Agreement and DIP budget previously filed with the Court showing DIP funding of $5 million.  The Parent led FTI to believe that the DIP funding of $5 million utilized in the budget would be available to fund both the Debtors' professional fees and

[79] See *Declaration of Pedro Pereira in Support of Motion for Order Authorizing Debtors to Engage FTI Consulting, Inc. as (1) Chief Restructuring Officer and Certain Other FTI Professionals as Temporary Employees to Debtors Pursuant to Bankruptcy Code Section 363 and (2) Financial Advisor and Exclusive Transaction Agent to the Debtors Pursuant to Bankruptcy Code Section 328* Nunc Pro Tunc *to March 6, 2014* [EFC No. 335], ¶¶ 12-16.
[80] See *Declaration of Michael Tucker in Support of Motion for Order Authorizing Debtors to Engage FTI Consulting, Inc. as (1) Chief Restructuring Officer and Certain Other FTI Professionals as Temporary Employees to Debtors Pursuant to Bankruptcy Code Section 363 and (2) Financial Advisor and Exclusive Transaction Agent to the Debtors Pursuant to Bankruptcy Code Section 328* Nunc Pro Tunc *to March 6, 2014* [EFC No. 334], ¶ 7.
[81] See *Notice of Amendment to Engagement Contract with FTI Consulting, Inc.* [ECF No. 610], Exhibit 1 thereto, p. 4.
[82] See *id.*, pp. 4-5.

ACTIVE 27666031v1 10/07/2014

their business operational needs.  The Owners also represented that they would support a plan of reorganization which, of necessity, would pay all administrative claims.  The Debtors believe that FTI relied both on the Debtors financial statements filed in the bankruptcy as well as the Debtors financial representations.  Further, the Debtors believe that FTI expected that it would have the benefit of a CEO, CFO, general counsel and controller in connection with its duties as CRO.

111.    However, soon after FTI's engagement, Kiser and Bernhart resigned, due to conflicts with the Parent.[83]  FTI was now left to fulfill the roles of CEO and CFO, in addition to CRO.  The Debtors' General Counsel and Controller subsequently resigned too, making FTI's (and the Debtors' bankruptcy counsel's) job that much greater in scope and complexity without the benefit of the knowledge, experience and time of all of those people.

112.    Tucker discussed the issue with Pereira, and indicated that the budget contemplated having a CEO, CFO, general counsel and controller.  FTI added a consultant shortly thereafter to help and informed Pereira that Tucker and the existing FTI staff were working twice as much as initially budgeted, and that additional management level personnel were needed.  Pereira acknowledged that FTI was usually the first in and last out each day and would need to be compensated for its work.  An internal budget prepared at the beginning of April 2014 included adding the cost of a CFO and Tucker made clear to Pereira that the Debtors required help in that function.  Pereira said that Portugal would not approve a person for a CFO, but finally agreed to adding another very experienced FTI person at the beginning of May (billed at a fixed monthly amount instead of standard hourly rates) to address certain issues involving the CBS projects and AR collection.

**M.    FTI Discovers That The Debtors' AR Is Worth Less Than The Owners Represented.**

113.    Immediately upon engagement, FTI's team of professionals set to work evaluating the Debtors' assets, including the AR.  On closer inspection, FTI concluded that the aggregate value of the AR was substantially less than the $15-18 million that the Owners, former management and

---

[83] See *Notice of Resignations of Klaus Bernhart and Roland Kiser* [ECF No. 528].

ACTIVE 27666031v1 10/07/2014

1  former advisors had estimated, and required substantial work to negotiate resolution and realize

2  value to the Debtors.[84]

3  **N.    The Owners Renege On The Promised Plan And Carve-Out, Seeking To Leave**

4  **The Professionals Unpaid.**

5  114.    After the Owners stated that they learned that (a) the value of the Debtors' assets

6  might be considerably less than what the Owners had represented to others earlier and (b) the

7  Debtors' professionals' fees would exceed the $2 million Carve-Out (negotiated before the Parent

8  insisted that the Debtors also retain FTI and Cathay took a scorched earth path due to the Parent not

9  paying under its guarantee), the Parent explicitly disavowed its commitment to fund the remaining

10  $2.49 million in DIP Financing and scrapped its proposed plan of reorganization.[85]

11  115.    Yet, during this same time frame, the Owners (through Rodrigues) responded to

12  purportedly incorrect articles claiming they were going to exit the U.S. market and sell the Debtors.

13  In an email describing the Owners' press releases on April 17, 2014, Rodrigues emphasized that

14  "Martifer Solar does not intend to sell the business or exit the market in the United States."[86]

15  116.    The Debtors, Cathay, the Parent and the Committee filed a stipulation on April 10,

16  2014, wherein the Parent agreed to pay Cathay $1.8 million by April 15, 2014.[87]  The Parent further

17  agreed "that the superpriority administrative claim granted under the Interim DIP Order shall be

18  subject to and expressly subordinate to the Carve-Out, . . . and (4) Parent is prepared to support the

19  liquidity needs of the Debtors."[88]

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

---

[84] See, e.g., *Declaration of Michael Tucker in Support of Debtor's Motion for Approval of Settlement Agreement, Pursuant to Fed. R. Bankr. P. 9019, Between Martifer Solar USA, Inc., Panasonic Eco Solutions North America, and Martifer Solar, Inc.* [EFC No. 870]; *Declaration of Michael Tucker in Support of Debtor's Motion for Approval of Settlement Agreement, Pursuant to Fed. R. Bankr. P. 9019, Between Martifer Solar USA, Inc., Chatsmouth, LLC, and Solar Optimum, Inc.* [ECF No. 672].
[85] See Lindsey Letter, Exhibit 13, p. 1.
[86] See April 17, 2014 email from Rodrigues and press releases, true and correct copies of which are attached hereto as **Exhibit 14**.
[87] See *Stipulation Between the Debtors, Martifer Solar Inc., Cathay Bank and the Official Committee of Unsecured Creditors* [ECF No. 606], p. 5, ll. 27-28.
[88] Id., p. 7, ll. 5-9.

ACTIVE 27666031v1 10/07/2014

117.    Subsequently, on April 14, 2014, the Parent and the Committee entered into a Binding Term Sheet,[89] wherein "Parent will provide any necessary funding for the implementation of the Plan above cash on hand in order to make Effective Date payments.  Parent will provide support for the feasibility of Plan."[90]  The Binding Term Sheet was filed with the Court as part of the Stipulation between the Debtors, Parent, Cathay and the Committee on May 9, 2014.[91]

118.    Despite all the representations described above, on or about May 1, 2014, nearly a month before the Owners signed and delivered the Management Representation Letter affirming the Parent's commitment to fully fund the DIP Financing and support a plan of reorganization,[92] the Parent advised that the Debtors' assets should be auctioned and that, pursuant to a letter of intent, it would "credit bid" the amounts that it paid to Cathay.  At the same time, the Parent filed the Parent Claims, asserting the right to subrogate to Cathay's claims.[93]

119.    Both tactics suit the Owners' unwavering goal of being paid in full to the detriment of all other claimants, including the professionals who have worked tirelessly to maximize the value of the estate for all parties.  Not only has the Parent reneged on its Funding Promise and its DIP Financing commitment by $2.49 million, but it also seeks to renege on its commitment to compensate the professionals hired and working at its behest.

**O.**    **The Owners Requested And Directly Benefitted From The Professionals' Services.**

120.    As set forth above, the Owners repeatedly promised to provide $5 million in DIP Financing and to fund the Debtors' liquidity needs (the "Owner Promises") in at least the following ways:

        a.    In the DIP Agreement, the Parent expressly agreed to provide funding to Debtors in the amount of $5 million and agreed to a Carve-Out of

---

[89]  See *Stipulation Between the Debtors, Martifer Solar Inc., Cathay Bank and the Official Committee of Unsecured Creditors* [ECF No.  739], Exhibit A thereto (the "Binding Term Sheet").

[90]  Id., p. 1.

[91]  See id.

[92]  See Management Representation Letter, Exhibit 12.

[93]  See, e.g., Parent's Amended Claim No. 33-2, filed in the Aurora Chapter 11 Case, stating that the Parent has a "Secured Loan: Subrogated to Rights of Cathay Bank."

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

31

ACTIVE 27666031v1 10/07/2014

1    approximately $2 million to pay the fees and expenses of Debtors'

2    professionals;[94]

3    b.    In February, 2014, the Owners proposed full-payment restructuring plan that

4    would pay Cathay in 1 year and other creditors in 3 years, envisioning using

5    the full $5 million in DIP Financing, plus additional working capital;[95]

6    c.    On April 10, 2014, the Parent promised to meet the Debtors' ongoing

7    liquidity needs pursuant to the Global Stipulation;[96]

8    d.    On April 14, 2014, the Parent further committed to provide funding to the

9    Debtors in the Binding Term Sheet with the Official Committee of Unsecured

10    Creditors;[97] and

11    e.    The notes to the Debtors' audited financial statements, and accompanying

12    Management Representation Letter delivered May 28, 2014, repeat the

13    Parent's commitment to (i) fund $5 million in DIP Financing, (ii) support the

14    Debtors' EPC projects for three years, and (iii) restructure the Debtors by

15    means of a plan of reorganization.[98]

16    121.    The Debtors' Court-approved professionals (the "Professionals") performed their

17    services (the "Services") in reliance on the Owner Promises detailed above.

18    122.    The overwhelming majority of the Services have been performed by the

19    Professionals at the request and direction of the Owners for their direct benefit.  These include

20    (a) seeking an injunction against enforcement of the Guaranty as part of the DIP Financing;

21    (b) preparing a plan of reorganization and disclosure statement based on the Parent's intended

22    conversion of the DIP Financing into equity; (c) negotiating and obtaining Court approval of the

23    Global Stipulation, which avoided litigation by Cathay against the Debtors and the Owners, while

24

25    [94] See Amended DIP Agreement, [ECF No. 87, Exhibit 1 thereto], p. 3 ("Carve-Out") & p. 6 ("Maximum Commitment Amount").

26    [95] See February 4, 2014 email from Pereira to Kiser, Exhibit 11.

    [96] See Global Stipulation [ECF No. 606], p. 7, ll. 8-12.

27    [97] See Binding Term Sheet [ECF No. 739, Exhibit A thereto], p. 1. Although the Debtors are beneficiaries of such Term Sheet, they did not negotiate the terms, nor are they signatories thereto.

28    [98] See 2013 Audited Financials, Exhibit 4, pp. 9-10; Management Representation Letter, Exhibit 12.

ACTIVE 27666031v1 10/07/2014

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

the Debtors focused on preparing the Parent's plan; (d) obtaining Court approval of the employment of FTI; (e) negotiating and obtaining Court approval of the settlement agreement with Panasonic that relieved the Owners of $199,726 in liability for indemnity to the surety; (f) fulfilling the roles of the Debtors' CEO, CFO, General Counsel and Controller after their departure and the Owners refusal to replace them; (g) preparing, marketing and due diligencing the Debtors' assets for sale as a going concern, thereby obtaining the highest and best value, as evidenced by the sale to BayWa; and (h) negotiating and documenting the Debtors' settlement of its disputes with Cathay concerning the secured value of Cathay's claim, pursuant to which Cathay provided the releases of collateral required as a condition to the closing of the BayWa sale, the proceeds of which were used, in part, to pay Cathay's secured claim in full (and reduce the Owners' liability under the Guaranty).

123.    All of these Services, and all of the other Services performed, benefitted the Owners by preserving the Debtors' going concern value, providing the necessary credibility to the marketing process for all of the Debtors' assets, and providing sufficient assets to pay Cathay (and reduce the Owners' liability under the Guaranty).

124.    As discussed above, the Owners took $2.49 million in promised DIP Financing (including the Carve-Out) and used it instead to pay down Cathay (thereby reducing the Owners' Guaranty exposure) before Cathay's secured claim was paid by the Debtors from the BayWa sale proceeds (as opposed to the Owners being required to pay under the Guaranty any remaining amounts owing to Cathay after its secured claim had been paid by the Debtors).  Now the Parent seeks, by way of "subrogation," to use that incidence of timing to allow it to be repaid the payments on its Guaranty ahead of all other creditors, including the Professionals.  It would be unjust and inequitable to allow the insider Owners to renege on their Promises and receive payment ahead and to the detriment of all non-insider creditors.

## III.

## RECHARACTERIZATION PURSUANT TO 11 U.S.C. § 105

125.    The Debtors hereby incorporate paragraphs 1 through 124 as though the same were set forth herein in full.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

126.    The Debtors seek to recharacterize as equity contributions any and all claims, including those reflected in the Owner Claims and/or asserted as a defense, that the Owners assert against the Debtors based on purported "loans" (the "Advances").

127.    This Court is empowered to order recharacterization as a matter of equity under 11 U.S.C. § 105.

128.    The Debtors are informed and believe that the Owners and/or their affiliates made alleged Advances aggregating approximately $46,604,223 (including purported interest) as of the Petition Date.

129.    Evidence that the Advances constitute equity contributions and not debt includes the following:

     a.     The Advances were not evidenced by any promissory notes or other loan documents.  Although the Parent attempted to formalize the purported "loans" after the Petition Date by having Pereira execute, on behalf of the Debtors, the Funding Agreement[99] back-dated to January 1, 2012, for the benefit of the Parent, the Debtors' Board subsequently rescinded such back-dated Funding Agreement.[100]

     b.     The Advances did not have a fixed maturity date or a fixed obligation to repay.

     c.     Although the Debtors' financials reflect that the Advances accrued interest, the Debtors never made any interest payments.

     d.     The Debtors were reliant on funding from the Owners and the Owners failed to provide the promised funding, which led to the undercapitalization of the Debtors.  As noted above, the Debtors had negative cash flow from operations of $3,334,654 in 2010,[101] negative $4,321,139 in 2011,[102] negative

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

---

[99] See Funding Agreement, a true and correct copy of which is annexed to the 1.29.14 Minutes, Exhibit 3.
[100] See Addendum to 1.29.14 Minutes, **Exhibit 7**, at p. 2, ¶ 4.
[101] See 2011 Audited Financials, Exhibit 5, p. 7.
[102] Id.

ACTIVE 27666031v1 10/07/2014

$18,398,245 in 2012,[103] and negative $2,091,909 in 2013.[104]

e.    The Advances were made by the Owners, who hold virtually all of the equity of Martifer USA.

f.    The Advances were unsecured.

g.    There is no evidence of the availability of other outside financing, and no reasonable creditor would have acted in the same manner as the Owners did.

h.    The Advances were subordinated to other creditors, including Cathay.

i.    There was no sinking fund for repayment of the Advances.

j.    The Parent has already "converted" $9.2 million of the Advances to equity, and was contemplating "converting" another $10 million,[105] demonstrating its intent that they be treated as equity contributions.

k.    Certain Advances were booked into the general ledger of the Debtors as loans by the Parent against the wishes of the then CEO and CFO.

130.    Recharacterization of the Advances as equity contributions is required to reflect the reality that they were intended as equity contributions.

131.    Based on among the facts and circumstances set forth in paragraphs 1 to 130 above, this Court should recharacterize the Advances as equity contributions under 11 U.S.C. § 105.

## IV.

### EQUITABLE DISALLOWANCE PURSUANT TO 11 U.S.C. § 510(C)

132.    The Debtors hereby incorporate paragraphs 1 through 131 as though the same were set forth herein in full.

133.    In the alternative, the Debtors seek the equitable disallowance of the Parent Claims and the Portugal Claims (collectively, the "Owner Claims").

134.    This Court is empowered to order the equitable disallowance of the Owner Claims under 11 U.S.C. § 510(c).

---

[103] See 2013 Audited Financials, Exhibit 4, p. 7.
[104] Id.
[105] See Conversion Letter, Exhibit 6.

ACTIVE 27666031v1 10/07/2014

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

135.    Equitable disallowance is warranted based on among the following facts, evidencing the insider Owners' inequitable conduct and its resulting material harm to non-insider creditors:

a.    The Parent is a wholly-owned subsidiary of Portugal and they have virtually identical ownership.

b.    The Parent is an insider of the Debtors.

c.    Other than the independent director of Martifer USA (who was appointed post-petition), the board of directors of Martifer USA is identical to the board of directors of the Parent.

d.    The Parent owns roughly 99% of the equity of Martifer USA and Martifer USA holds 99% of the equity of Aurora. Pedro Pereira was the President of both the Parent and Martifer USA. There was such unity of interest and ownership that the Debtors were virtually inseparable from the Owners.

e.    The principal places of business of the Parent and Martifer USA were the same.

f.    The Owners' officers are Martifer USA's directors, formed Martifer USA's executive committee and made all decisions on behalf of the Debtors.

g.    The Owners caused the Debtors to hire the Owners' employees, so that the Owners and the Debtors shared employees.

h.    The Owners caused the Debtors to place the Owners' employees in the Debtors' financial departments to control the Debtors' finances. Such employees did not act in the interests of the Debtors, but took direction from the Parent. See, e.g., supra Paragraphs 36 & 51.

i.    The Owners caused the Debtors to place the Owners' employees in managerial positions within the Debtors. Such employees did not act in the interests of the Debtors, but took direction from the Parent.

j.    The Owners hired and/or fired personnel of the Debtors.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

k.    The Parent dictated that the Debtors retain FTI, and FTI was selected and approved by the Parent's management with the understanding and promise that FTI would be paid in full for its services.

l.    The Owners required the Debtors to use the Owners' shared accounting system.

m.    The Owners treated the Debtors' assets and funds as their own.

n.    The Owners consistently disregarded corporate formalities, including but not limited to, making purported loans to the Debtors without formal observance of corporate formalities.

o.    The Debtors were reliant on funding from the Owners and the Owners failed to provide the promised funding, which led to the undercapitalization of the Debtors.    As noted above, the Debtors had negative cash flow from operations of $3,334,654 in 2010,[106] negative $4,321,139 in 2011,[107] negative $18,398,245 in 2012,[108] and negative $2,091,909 in 2013.[109]

p.    The Owners pressured the Debtors to meet unrealistically high projections (for purposes of the Owners' financial representations to their shareholders), but failed to provide the Debtors with the necessary financial support to cash flow all of the requisite new projects, causing the Debtors to default in their payments to vendors/subcontractors and resulting in mechanics liens being filed against the projects.

q.    The Owners interfered in the Debtors' potential partnership with Panasonic by, among other things, expanding the proposal to include Martifer Group European businesses; the Owners' interference ultimately caused  Panasonic to withdraw from the partnership proposal.

---

[106] See 2011 Audited Financials, Exhibit 5, p. 7.
[107] Id.
[108] See 2013 Audited Financials, Exhibit 4, p. 7.
[109] Id.

ACTIVE 27666031v1 10/07/2014

r.   The Owners caused the Debtors to take out the secured Cathay Loan and immediately transfer the bulk of the proceeds to the Owners and their affiliates (in alleged reduction of the Parent's purported "debt"), saddling the Debtors with an additional $8,800,755 in secured debt.

s.   The Owners caused the Debtors to take purported loans from the Parent, and burdened the Debtors with additional debt, solely to enable the Debtors to pay down the Cathay Loan, and reduce the Owners' exposure on the Guaranty.

t.   The Parent would not allow the Debtors to file for reorganization when their management believed it was appropriate, and instead forced the Debtors to use their assets to pay down the Cathay Loan for the benefit of the Owners and to the detriment of the Debtors, leaving the Debtors sorely undercapitalized in the reorganization.

u.   The Parent caused the Debtors to employ and retain Professionals by representing that it would fully fund the $5 million DIP Financing and support a plan of reorganization (which necessarily provided that administrative claims would be paid in full) and continued to represent such support through May 28, 2014, after the Professionals provided Services that maximized the value of the Debtors' estates by means of an extensive sale process (which astronomically increased the amount of the Professional Fees) that resulted in the sale of assets to BayWa in excess of the amount of the Cathay allowed secured claim; then, after the Professionals provided Services that uncovered the true value of the Debtors' assets, the insider Parent used the promised DIP Financing funds to instead pay down their obligations under their Guaranties to Cathay, to the material detriment of all non-insider creditors, including the Professionals that had been induced by the Owner Promises.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

38

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

v.    The insider Parent now inequitably seeks to assert a right to subrogation based on its payment of $2.5 million in promised DIP Financing to Cathay (in reduction of the Owners' liability under the Guaranty) to further insure that all remaining value of the Debtors' estates is paid to the insider Parent, to the material detriment of all non-insider creditors, including administrative claimants.

136.    As set forth above, the Owners' misconduct has resulted in harm to the Debtors' creditors and conferred an unfair advantage on the Owners.

137.    Based on among the facts and circumstances set forth in paragraphs 1 to 136 above, this Court should equitably disallow the Owner Claims under 11 U.S.C. § 510(c).

**V.**

**EQUITABLE SUBORDINATION PURSUANT TO 11 U.S.C. § 510(C)**

138.    The Debtors hereby incorporate paragraphs 1 through 137 as though the same were set forth herein in full.

139.    In the alternative, the Debtors seek the equitable subordination of the Owner Claims for the reasons and based on the facts alleged in paragraphs 1 to 136 above.

140.    This Court is empowered to order the equitable subordination of the Owner Claims under 11 U.S.C. § 510(c).

141.    Based on among the facts and circumstances set forth in paragraphs 1 to 140 above, this Court should equitably subordinate the Owner Claims under 11 U.S.C. § 510(c).

**VI.**

**SURCHARGE PURSUANT TO 11 U.S.C. § 506(C)**

142.    The Debtors hereby incorporate paragraphs 1 through 141 as though the same were set forth herein in full.

143.    As set forth in the *Debtors' Objection to Proof of Claim No.33 (in Case No. 14-10355) and Proof of Claim No. 60 (in Case No. 14-10357) with Respect to Subrogation filed by Martifer Solar, Inc.* [EFC No. 883] (the "Claim Objection"), the Debtors object to the Parent Claims to the extent that they seek subrogation to Cathay or otherwise purport to be secured claims.

39

144.    If this Court does not disallow the secured status of the Parent Claims as requested in the Claim Objection, and does not Order recharacterization, equitable disallowance and/or equitable subordination of the Owner Claims as requested above, the Debtors alternatively seek to surcharge the Owner Claims for aggregate amount of fees incurred (the "Professional Fees") for the Services performed by the Professionals from the Petition Date until the date that the Chapter 11 Cases are closed.

145.    The overwhelming majority of the Services have been performed by the Professionals at the request and direction of the Owners for their direct benefit.  These include, *inter alia*, (a) seeking an injunction against enforcement of the Guaranty as part of the DIP Financing; (b) preparing a plan of reorganization and disclosure statement based on the Parent's intended conversion of the DIP Financing into equity; (c) negotiating and obtaining Court approval of the Global Stipulation, which avoided litigation by Cathay against the Debtors and the Owners, while the Debtors focused on preparing the Parent's plan; (d) obtaining Court approval of the employment of FTI; (e) negotiating and obtaining Court approval of the settlement agreement with Panasonic that relieved the Owners of  $199,726 in liability for indemnity to the surety; (f) fulfilling the roles of the Debtors' CEO, CFO and General Counsel after their departure and the Owners refusal to replace them; (g) preparing, marketing and due diligencing the Debtors' assets for sale as a going concern, thereby obtaining the highest and best value of the assets sold, as evidenced by the sale to BayWa; and (h) negotiating and documenting the Debtors' settlement of its disputes with Cathay concerning the secured value of Cathay's claim, pursuant to which Cathay provided the releases of collateral required as a condition to the closing of the BayWa sale, the proceeds of which were used, in part, to pay Cathay's secured claim in full (and reduce the Owners' liability under the Guaranty).

146.    All of these Services, and all of the other Services performed, benefitted the Owners by preserving the Debtors' going concern value, assuring sufficient assets to pay Cathay in full (and eliminate the Owners' exposure on the Guaranty).

147.    This Court is empowered to surcharge the Owner Claims for the amount of the Professional Fees under 11 U.S.C. § 506(c).

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

148.    The Professional Fees incurred are reasonable, necessary and beneficial to the Owners' recovery of any amounts on the Owner Claims.

149.    The Professionals performed the Services based on the Owners' representations that they would be paid for such Services.

150.    If the Professionals had not performed the Services, the Debtors' Chapter 11 Cases would have been converted to Chapter 7, and no creditors, other than Cathay, would have received any recovery on their claims.

151.    Based on among the facts and circumstances set forth in paragraphs 1 to 150 above, this Court should surcharge the Owner Claims for the Professional Fees under 11 U.S.C. § 506(c).

## VII.

## AVOIDANCE OF PREFERENCES PURSUANT TO 11 U.S.C. § 547(B)

152.    The Debtors hereby incorporate paragraphs 1 through 151 as though the same were set forth herein in full.

153.    During the year before the Petition Date, the Debtors made payments of approximately $3,512,055.92 to Cathay on the Cathay Loan (the "Bank Paydowns"):[110]

| Date | Payment Amount |
|---|---|
| 1/31/2013 | $42,238.37 |
| 2/28/2013 | $38,150.79 |
| 3/22/2013 | $423,647.25 |
| 4/1/2013 | $42,238.37 |
| 4/11/2013 | $889,555.13 |
| 4/30/2013 | $36,233.65 |
| 5/31/2013 | $36,584.30 |
| 6/6/2013 | $95,000.00 |
| 7/3/2013 | $35,087.50 |

---

[110] See Lewis Declaration [ECF No. 60], Exhibit 12 thereto.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

ACTIVE 27666031v1 10/07/2014

| Date | Payment Amount |
|---|---|
| 8/1/2013 | $36,175.28 |
| 9/11/2013 | $36,175.28 |
| 9/30/2013 | $35,008.33 |
| 10/2/2013 | $100,000.00 |
| 10/15/2013 | $150,000.00 |
| 10/15/2013 | $150,000.00 |
| 10/24/2013 | $150,000.00 |
| 10/30/2013 | $150,000.00 |
| 10/31/2013 | $34,980.84 |
| 11/6/2013 | $250,000.00 |
| 11/13/2013 | $250,000.00 |
| 11/20/2013 | $250,000.00 |
| 11/27/2013 | $250,000.00 |
| 11/27/2013 | $30,980.83 |
| **Total Payments** | **$3,512,055.92** |

154.    In addition, on December 4, 2013, Cathay unilaterally swept $300,000 from Martifer Solar USA's bank account at Cathay; and on December 11, 2013, Cathay unilaterally swept $100,000 from Martifer Solar USA's bank account at Cathay (the "Bank Sweeps").

155.    Because the Debtors' AR was overstated from the inception of the Cathay Loan, without appropriate reserves, at all times that the Bank Paydowns and Bank Sweeps occurred, the value of Cathay's collateral was worth less than the outstanding amount of the Cathay Loan.

156.    The Debtors are informed and believe that, during the year before the Petition Date, the Debtors made payments of approximately $1,325,969.05 on debts they owed to other creditors (collectively, the "Vendors") that the Owners were also liable for and/or had guaranteed (the "Vendor Paydowns"):

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

ACTIVE 27666031v1 10/07/2014

| Date | Vendor | Payment Amount |
|------|--------|----------------|
| 1/25/2013 | Hanwha | $ 100,000.00 |
| 1/28/2013 | Raffi S. Agopian | $ 3,000.00 |
| 1/29/2013 | Raffi S. Agopian | $ 9,615.38 |
| 2/6/2013 | Hanwha | $ 100,000.00 |
| 2/8/2013 | Raffi S. Agopian | $ 9,615.38 |
| 2/12/2013 | Raffi S. Agopian | $ 40,620.86 |
| 2/19/2013 | Raffi S. Agopian | $ 160.00 |
| 2/21/2013 | Hanwha | $ 100,000.00 |
| 2/22/2013 | Raffi S. Agopian | $ 9,615.38 |
| 2/28/2013 | Raffi S. Agopian | $ 100.00 |
| 3/8/2013 | Raffi S. Agopian | $ 9,615.38 |
| 3/15/2013 | Raffi S. Agopian | $ 2,105.97 |
| 3/22/2013 | Raffi S. Agopian | $ 9,615.38 |
| 3/26/2013 | Hanwha | $ 104,894.54 |
| 3/27/2013 | Raffi S. Agopian | $ 3,721.03 |
| 3/27/2013 | Raffi S. Agopian | $ 10.00 |
| 4/5/2013 | Raffi S. Agopian | $ 9,615.38 |
| 4/19/2013 | Raffi S. Agopian | $ 6,730.77 |
| 5/3/2013 | Raffi S. Agopian | $ 6,730.77 |
| 5/7/2013 | Raffi S. Agopian | $ 40,911.64 |
| 5/17/2013 | Raffi S. Agopian | $ 6,730.77 |
| 5/31/2013 | Raffi S. Agopian | $ 6,730.77 |
| 6/14/2013 | Raffi S. Agopian | $ 6,730.77 |
| 6/28/2013 | Raffi S. Agopian | $ 6,730.77 |
| 7/12/2013 | Raffi S. Agopian | $ 6,730.77 |
| 7/26/2013 | Raffi S. Agopian | $ 6,730.77 |
| 8/6/2013 | Creotecc | $ 125,000.00 |
| 8/9/2013 | Raffi S. Agopian | $ 6,730.77 |
| 8/14/2013 | Creotecc | $ 400,000.00 |

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ACTIVE 27666031v1 10/07/2014

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

| Date | Vendor | Payment Amount |
|---|---|---|
| 8/23/2013 | Raffi S. Agopian | $      6,730.77 |
| 9/6/2013 | Raffi S. Agopian | $      6,730.77 |
| 9/20/2013 | Raffi S. Agopian | $      6,057.73 |
| 10/4/2013 | Raffi S. Agopian | $      6,730.77 |
| 10/18/2013 | Raffi S. Agopian | $      6,730.77 |
| 11/1/2013 | Raffi S. Agopian | $      6,730.77 |
| 11/15/2013 | Raffi S. Agopian | $      6,730.77 |
| 11/22/2013 | Stones River Electric | $    100,000.00 |
| 11/29/2013 | Raffi S. Agopian | $      6,730.77 |
| 12/13/2013 | Raffi S. Agopian | $      6,730.77 |
| 12/27/2013 | Raffi S. Agopian | $      6,730.77 |
| 1/10/2014 | Raffi S. Agopian | $      6,730.77 |
| 1/13/2014 | Wolf Rifkin Shapiro | $     13,810.37 |
|  | **Total Payments** | **$1,325,969.05** |

157.    Moreover, the Debtors are informed and believe that, during the year before the Petition Date, the Debtors made approximately $1,272,500 in wire transfers to the Parent (the "Parent Transfers"):[111]

| Date | Payment Amount |
|---|---|
| 2/4/2013 | 40,000.00 |
| 3/4/2013 | 45,000.00 |
| 4/30/2013 | 2,000.00 |
| 5/15/2013 | 1,100,000.00 |
| 6/3/2013 | 62,000.00 |
| 6/13/2013 | 10,500.00 |
| 6/27/2013 | 1,000.00 |

---

[111] See Martifer USA's *Statement of Financial Affairs* [ECF No. 108], #3c, p. 17.

ACTIVE 27666031v1 10/07/2014

| Date | Payment Amount |
|---|---|
| 7/18/2013 | 12,000.00 |
| **Total Payments** | **$1,272,500.00** |

158.    This Court is empowered to avoid the Bank Paydowns, the Bank Sweeps, the Vendor Paydowns, and the Parent Transfers (collectively, the "Preferential Transfers") under 11 U.S.C. § 547(b).

159.    The Bank Paydowns, Bank Sweeps and Vendor Paydowns (collectively, the "Guaranteed Transfers") constitute preferential transfers under 11 U.S.C. § 547(b) based on among the following facts:

a.    The Owners are insiders and creditors of the Debtors.  See Owner Claims.

b.    All Guaranteed Transfers were made for the benefit of the Owners by reducing their exposure on their guarantees, including the Guaranty.

c.    All Guaranteed Transfers were made on account of the Debtors' antecedent debt owed to Cathay and the Vendors.

d.    All Guaranteed Transfers were made while the Debtors were insolvent.

e.    All Guaranteed Transfers were made within 1 year of the Petition Date.

f.    All Guaranteed Transfers enabled the Owners to receive more on their alleged claims than they would have if the Bankruptcy Cases were converted to chapter 7 and the Guaranteed Transfers had not been made.

160.    The Parent Transfers constitute preferential transfers under 11 U.S.C. §547(b) based on among the following facts:

a.    The Parent is an insider and creditor of the Debtors.  See Parent Claims.

b.    All Parent Transfers were made directly to the Parent on account of purported antecedent debt.

c.    All Parent Transfers were made while the Debtors were insolvent.

d.    All Parent Transfers were made within 1 year of the Petition Date.

ACTIVE 27666031v1 10/07/2014

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

e.    All Parent Transfers enabled the Parent to receive more on its alleged claims than it would have if the Bankruptcy Cases were converted to chapter 7 and the Parent Transfers had not been made.

161.    Based on among the facts and circumstances set forth in paragraphs 1 to 160 above, this Court should avoid the Preferential Transfers under 11 U.S.C. § 547(b).

## VIII.

## AVOIDANCE OF CONSTRUCTIVE FRAUDULENT TRANSFERS

## PURSUANT TO 11 U.S.C. § 548(A)(1)(B)

162.    The Debtors hereby incorporate paragraphs 1 through 161 as though the same were set forth herein in full.

163.    The Debtors are informed and believe that, during the two years before the Petition Date, the Debtors made approximately $16,851,541.28[112] in transfers to or for the benefit of the Defendants and/or their affiliates (the "Direct Fraudulent Transfers"):

| Date | Owner Entity | Payment Amount |
|---|---|---|
| 4/3/2012 | Martifer Solar, Inc. | $        35,000.00 |
| 6/26/2012 | Martifer Solar, Inc. | $      300,000.00 |
| 6/26/2012 | Martifer Sistemas Solares | $   1,900,000.00 |
| 7/18/2012 | Martifer Silverado Fund | $      250,000.00 |
| 8/3/2012 | Southern California Edison | $      450,000.00 |
| 8/13/2012 | Martifer Silverado Fund | $      100,000.00 |
| 8/22/2012 | Ontario Solar Provider | $      101,973.09 |
| 8/23/2012 | Martifer Solar, Inc. | $        50,000.00 |
| 9/4/2012 | Martifer Solar, Inc. | $        32,000.00 |
| 9/6/2012 | Martifer Silverado Fund | $        10,000.00 |
| 9/10/2012 | Martifer Solar, Inc. | $        54,000.00 |
| 9/13/2012 | Ontario Solar Provider | $      104,070.24 |

[112] This amount includes $5,099,714 in payments for modules that the Owners caused Debtors to purchase from Portugal.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

ACTIVE 27666031v1 10/07/2014

| Date | Owner Entity | Payment Amount |
|---|---|---|
| 9/13/2012 | Martifer Solar SA | $ 1,700,000.00 |
| 9/14/2012 | Martifer Solar, Inc. | $ 150,000.00 |
| 9/14/2012 | Martifer Solar Canada | $ 21,039.34 |
| 9/20/2012 | Martifer Solar, Inc. | $ 200,000.00 |
| 9/24/2012 | Martifer Solar, Inc. | $ 458,958.61 |
| 9/26/2012 | Martifer Solar SA | $ 500,000.00 |
| 9/28/2012 | Martifer Solar, Inc. | $ 52,000.00 |
| 10/1/2012 | Martifer Solar, Inc. | $ 33,000.00 |
| 10/1/2012 | Martifer Solar SA | $ 1,000,000.00 |
| 10/5/2012 | Martifer Solar, Inc. | $ 250,000.00 |
| 10/9/2012 | Martifer Solar, Inc. | $ 150,000.00 |
| 10/9/2012 | Martifer Solar SA | $ 850,000.00 |
| 10/30/2012 | Martifer Silverado Fund | $ 140,000.00 |
| 11/1/2012 | Martifer Solar, Inc. | $ 33,000.00 |
| 11/1/2012 | Martifer Solar, Inc. | $ 52,000.00 |
| 11/2/2012 | Martifer Solar Canada | $ 30,000.00 |
| 11/6/2012 | Southern California Edison | $ 116,000.00 |
| 11/28/2012 | Martifer Solar, Inc. or Martifer Solar Canada | $ 370,000.00 |
| 11/28/2012 | Martifer Solar SA | $ 4,130,000.00 |
| 12/14/2012 | Martifer Silverado Fund | $ 50,000.00 |
| 12/14/2012 | Martifer Silverado Fund | $ 1,000,000.00 |
| 12/17/2012 | Martifer Silverado Fund | $ 900,000.00 |
| 12/20/2012 | Martifer Solar, Inc. | $ 6,000.00 |
| 2/4/2013 | Martifer Solar, Inc. | $ 40,000.00 |
| 3/4/2013 | Martifer Solar, Inc. | $ 45,000.00 |
| 4/30/2013 | Martifer Solar, Inc. | $ 2,000.00 |
| 5/15/2013 | Martifer Solar, Inc. | $ 1,100,000.00 |
| 6/3/2013 | Martifer Solar, Inc. | $ 62,000.00 |
| 6/13/2013 | Martifer Solar, Inc. | $ 10,500.00 |

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

ACTIVE 27666031v1 10/07/2014

| Date | Owner Entity | Payment Amount |
|------|--------------|----------------|
| 6/27/2013 | Martifer Solar, Inc. | $          1,000.00 |
| 7/18/2013 | Martifer Solar, Inc. | $        12,000.00 |
|  | **Total Payments** | **$16,851,541.28** |

164.    In addition, the Debtors were required to pay Cathay $5,000 in audit fees, $78,700 in loan fees and finance charges, and $403,854 in interest/costs over the life of the Cathay Loan, two-thirds of which (in the aggregate amount of approximately $320,854) (the "Bank Fraudulent Transfers") were for the sole benefit of the Defendants, who had received $6,456,000 in Cathay Loan proceeds.  The Direct Fraudulent Transfers and the Bank Fraudulent Transfers are collectively referred to herein as the "Fraudulent Transfers."

165.    This Court is empowered to avoid the Fraudulent Transfers under 11 U.S.C. § 548(a)(1)(B).

166.    The Fraudulent Transfers constitute constructive fraudulent transfers under 11 U.S.C. § 548(a)(1)(B) based on among the following facts:

a.    The Debtors received less than reasonably equivalent value in exchange for each of the Fraudulent Transfers.  Even if the Defendants assert that some or all of the Fraudulent Transfers were recorded as a credit against the Advances in the Debtors' books and records, as demonstrated in Sections II & III above, none of such Advances constituted valid debt; rather, all such Advances must be recharacterized as equity contributions.

b.    The Debtors were insolvent on the date that each of the Fraudulent Transfers was made and/or became insolvent as a result of such Fraudulent Transfers.

c.    The Debtors were engaged in business or a transaction, or were about to engage in business or a transaction for which any property remaining with the Debtors was an unreasonably small capital.

d.    The Debtors intended to incur, or believed that the Debtors would incur, debts that would be beyond the Debtor's ability to pay as such debts matured.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

48

167.    Based on among the facts and circumstances set forth in paragraphs 1 to 166 above, this Court should avoid the Fraudulent Transfers under 11 U.S.C. § 548(a)(1)(B).

## IX.

### AVOIDANCE OF CONSTRUCTIVE FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. § 544(B) AND CAL. CIV. CODE §§ 3439.04(A)(2) & 3439.05

168.    The Debtors hereby incorporate paragraphs 1 through 167 as though the same were set forth herein in full.

169.    In addition to the transfers described in paragraph 163 herein, the Debtors are informed and believe that they made approximately $12,323,675[113] in additional transfers to or for the benefit of the Defendants and/or their affiliates (the "Additional Fraudulent Transfers") during the four years before the Petition Date:

| Date | Owner Entity | Payment Amount |
|---|---|---|
| 2/1/2010 | TMAD Taylor & Gaines | $        18,000.00 |
| 2/1/2010 | TMAD Taylor & Gaines | $          5,523.75 |
| 2/9/2010 | Martifer Solar, Inc. | $        21,000.00 |
| 3/25/2010 | Martifer Solar, Inc. | $    1,000,000.00 |
| 7/1/2010 | TMAD Taylor & Gaines | $          4,151.25 |
| 8/4/2010 | Martifer Solar, Inc. | $      200,000.00 |
| 12/15/2010 | Martifer Solar, Inc. | $      100,000.00 |
| 12/31/2010 | Martifer Solar, Inc. | $      500,000.00 |
| 12/31/2010 | Martifer Solar, Inc. | $      300,000.00 |
| 3/3/2011 | Martifer Solar, Inc. | $      700,000.00 |
| 3/24/2011 | Martifer Solar, Inc. | $      100,000.00 |
| 4/15/2011 | Martifer Solar, Inc. | $      100,000.00 |
| 4/21/2011 | Martifer Solar, Inc. | $      900,000.00 |
| 6/17/2011 | Martifer Solar, Inc. | $    1,300,000.00 |
| 7/15/2011 | Martifer Solar, Inc. | $      700,000.00 |

[113] This amount includes $747,086 in payments for modules that the Owners caused Debtors to purchase from Portugal.

49

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

| Date | Owner Entity | Payment Amount |
|------|--------------|----------------|
| 8/9/2011 | Martifer Solar, Inc. | $        750,000.00 |
| 8/24/2011 | Martifer Solar, Inc. | $     1,400,000.00 |
| 9/9/2011 | Martifer Solar SA | $        700,000.00 |
| 10/7/2011 | Martifer Solar, Inc. | $        500,000.00 |
| 11/28/2011 | Martifer Solar, Inc. | $          75,000.00 |
| 11/29/2011 | Martifer Solar, Inc. | $        925,000.00 |
| 12/9/2011 | Martifer Solar, Inc. | $        500,000.00 |
| 12/30/2011 | Martifer Solar, Inc. | $        700,000.00 |
| 1/5/2012 | Martifer Solar, Inc. | $          50,000.00 |
| 1/12/2012 | Martifer Solar SA | $        375,000.00 |
| 1/19/2012 | Martifer Solar SA | $        400,000.00 |
|  | **Total Payments** | **$ 12,323,675.00** |

170.    The Fraudulent Transfers and the Additional Fraudulent Transfers are collectively referred to as the "Total Fraudulent Transfers."

171.    This Court is empowered to avoid the Total Fraudulent Transfers under 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.04(a)(2) & 3439.05.

172.    The Total Fraudulent Transfers constitute constructive fraudulent transfers under Cal. Civ. Code §§ 3439.04(a)(2) & 3439.05 based on among the following facts:

a.      The Debtors received less than reasonably equivalent value in exchange for each of the Total Fraudulent Transfers.  Even if the Defendants assert that some or all of the Total Fraudulent Transfers were recorded as a credit against the Advances in the Debtors' books and records, as demonstrated in Sections II & III above, none of such Advances constituted valid debt; rather, all such Advances must be recharacterized as equity contributions.

b.      The Debtors were engaged or were about to engage in a business or a transaction for which the remaining assets of the Debtors were unreasonably small in relation to the business or transaction.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

ACTIVE 27666031v1 10/07/2014

c.     The Debtors intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due.

d.     The Debtors were insolvent on the date that each of the Total Fraudulent Transfers was made and/or became insolvent as a result of such Total Fraudulent Transfers.

173.   Each of the Total Fraudulent Transfers is voidable under Cal. Civ. Code §§ 3439.04(a)(2) & 3439.05 by a creditor holding an unsecured claim against the Debtors that is allowable under 11 U.S.C. § 502.

174.   Based on among the facts and circumstances set forth in paragraphs 1 to 173 above, this Court should avoid the Total Fraudulent Transfers under 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.04(a)(2) & 3439.05.

## X.

## RECOVERY OF AVOIDED TRANSFERS PURSUANT TO 11 U.S.C. § 550 AND PRESERVATION OF AVOIDED TRANSFERS PURSUANT TO 11 U.S.C. § 551

175.   The Debtors hereby incorporate paragraphs 1 through 174 as though the same were set forth herein in full.

176.   To the extent that the Preferential Transfers, the Fraudulent Transfers and/or the Total Fraudulent Transfers (collectively, the "Avoidable Transfers") are avoided under sections 544, 547 and/or 548, the Debtors are entitled to recover the Avoidable Transfers from the Defendants under 11 U.S.C. § 550, and such Avoidable Transfers are preserved for the benefit of the Estates under 11 U.S.C. § 551.

177.   Based on among the facts and circumstances set forth in paragraphs 1 to 176 above, this Court should Order that the Debtors are entitled to recover the Avoidable Transfers from the Defendants under 11 U.S.C. § 550, and such Avoidable Transfers are preserved for the benefit of the Estates under 11 U.S.C. § 551.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

ACTIVE 27666031v1 10/07/2014

## XI.

### DISALLOWANCE OF CLAIMS PURSUANT TO 11 U.S.C. §502(D)

178.    The Debtors hereby incorporate paragraphs 1 through 177 as though the same were set forth herein in full.

179.    Based on among the facts and circumstances set forth in paragraphs 1 to 177 above, this Court should Order that any and all claims asserted against the Debtors by each Defendant, including any and all Owner Claims and any and all claims based on DIP Financing, are disallowed under 11 U.S.C. § 502(d) unless and until such Defendant returns all Avoidable Transfers that the Debtors are entitled to recover from such Defendant.

## XII.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

a)    Enter judgment on all of the Plaintiffs' claims in favor of the Plaintiffs and against the Defendants;

b)    Order the recharacterization of the Advances;

c)    Order the equitable disallowance of the Owner Claims;

d)    Order the equitable subordination of the Owner Claims;

e)    Authorize the Debtors to surcharge the Parent pursuant to 11 U.S.C. § 506(c);

f)    Avoid the Preferential Transfers pursuant to 11 U.S.C. § 547(b);

g)    Avoid the Fraudulent Transfers pursuant to 11 U.S.C. § 548;

h)    Avoid the Total Fraudulent Transfers pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.04(a)(2) & 3439.05;

i)    Authorize the Debtors to recover the Avoidable Transfers from the Defendants pursuant to 11 U.S.C. § 550(a) and preserve the Avoidable Transfers for the benefit of the Estates pursuant to 11 U.S.C. § 551;

j)    Order that any and all claims asserted by each Defendant against the Debtors, including any and all Owner Claims, are disallowed under 11 U.S.C. § 502(d) unless and until such

ACTIVE 27666031v1 10/07/2014

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

1  Defendant returns all Avoidable Transfers that the Debtors are entitled to recover from such

2  Defendant;

3  k)    Award the Debtors pre-judgment and post-judgment interest at the maximum

4  statutory rate;

5  l)    Award the Debtors all reasonable attorney's fees and costs incurred in the

6  prosecution of this matter; and

7  m)    Grant the Debtors such other and further relief as the Court deems just and

8  appropriate under the circumstances.

9  DATED this 7th day of October, 2014.

10

**FOX ROTHSCHILD LLP**

11

12  By:    /s/Dawn M. Cica
         DAWN M. CICA, ESQ.

13         Nevada Bar No. 4565
         MICAELA RUSTIA MOORE, ESQ.

14         Nevada Bar No. 9676
         3800 Howard Hughes Parkway, Suite 500

15         Las Vegas, Nevada 89169
         *Counsel for Martifer Aurora Solar, LLC and Martifer*

16         *Solar USA, Inc.*

17

18

19

20

21

22

23

24

25

26

27

28

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

53

**VERIFICATION**

STATE OF ARIZONA        )
                        ) ss:
COUNTY OF MARICOPA      )

MICHAEL TUCKER, being first duly sworn, deposes and states:

Under penalties of perjury, the undersigned declares that:

1.     I am the Chief Restructuring Officer of Martifer Solar USA, Inc., Plaintiff named in the foregoing Verified Complaint;

2.     I am required to know and, in fact, am familiar with the jobs of Plaintiff's employees who work on and with Plaintiff's books, files, documents, as well as the methods Plaintiff uses in making bookkeeping entries and maintaining the records for which I am ultimately responsible;

3.     I have personally worked with and on Plaintiff's records and have personal knowledge that the records were and are kept in the usual and ordinary course of business and the entries therein are made at or about the time of the events recorded by individuals employed by Plaintiff who have had personal knowledge thereof and who have had a continuing business duty to make those entries and record those events at or about the time of the events recorded;

4.     I know the contents of the Verified Complaint; and

5.     The Verified Complaint is true of my own knowledge, except as to those matters stated on information and belief, and that as to such matters I believe it to be true.

_Michael A Tucker CRO_
_____
MICHAEL TUCKER, Chief Restructuring Officer
Martifer Solar USA, Inc.

SUBSCRIBED and SWORN to before me
This 7th day of October, 2014

_____
NOTARY PUBLIC

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

54

ACTIVE 27666031v1 10/07/2014

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

1

## EXHIBITS

| | |
|---|---|
| 1 | Shareholders Agreement (3/26/08) |
| 2 | Action by Written Consent (5/4/13) |
| 3 | 1.29.14 Minutes |
| 4 | 2013 Audited Financials |
| 5 | 2011 Audited Financials |
| 6 | Conversion Letter (12/24/13 – 1/5/14) |
| 7 | Addendum to 1.29.14 Minutes |
| 8 | 7.8.13 Minutes |
| 9 | 1.16.14 Minutes |
| 10 | Comfort Letter (12/10/12 and 5/31/13) |
| 11 | Email from Pereira to Kiser (2/4/14) |
| 12 | Management Representation Letter (4/30/14) and transmittal email from Pereira to Auditors (5/28/14) |
| 13 | Lindsey Letter (6/20/14) |
| 14 | Email from Rodrigues (4/17/14) and Press Releases |

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ACTIVE 27666031v1 10/07/2014